## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**ROBERT SINCLAIR LEE,**

      **Plaintiff,**

**v.**                           **Case No. 3:24-cv-321-TKW-HTC**

**JACOB GRIMM, *et al.*,**

      **Defendants.**

_____/

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56, Federal Rules of Civil Procedure, Defendants Coates, Gerencser, Grimm, Hartley, Perkins, Trumble, White and Young ("Defendants" or individually by name) hereby move for summary judgment in their favor for the following reasons:

I.      Plaintiff failed to prove a constitutional violation against Defendants;

II.    Defendants are entitled to qualified immunity;

III.   Plaintiff is not entitled to compensatory or punitive damages per 42 U.S.C. § 1997e(e).

## PRELIMINARY STATEMENT

Plaintiff, Robert Sinclair Lee, DC# T15204, is a prisoner within the custody of the Florida Department of Corrections ("FDC") and initiated this action by mailing a Complaint on July 1, 2024. (Doc. 1 at 1).

1

Defendants Coates, Gerencser, Grimm, Hartley, Perkins, Trumble, White and Young were employees of FDC at the time of the allegations contained in Plaintiff's Complaint and Amended Complaint. (Doc. 1 and 11). Specifically, Defendants Captain White and Dorm Officer Hartley were assigned to Santa Rosa Correctional Institution – Annex ("Annex") (Exh. L at 2); while Lieutenant Grimm was also assigned to the Annex but at the Mental Health Unit. (Exh. M at 2). Defendants Officer Coates, Officer Gerencser, Sergeant Perkins, Officer Trumble, and Officer Young were assigned to Santa Rosa Correctional Institution – Main Unit ("Main Unit") in the Close Management ("CM") dormitories. (Exh. N at 8-9).

## PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that on May 17, 2024, Defendants Coates, Gerencser, Grimm, Hartley, Perkins, Trumble, White and Young used excessive force or failed to intervene to stop the excessive force at the Main Unit after he refused to be placed inside his new cell assignment. (Doc. 11). Plaintiff alleges that he was escorted by Defendants from the Annex to E-Dorm, located in the Main Unit, to be housed in cell E-2102; however, once the escort arrived at cell E-2102, he told Hartley, Young, and Perkins that he was not going inside the cell. (*Id.* at 10, ¶¶3, 14-17). In response to his refusal, Plaintiff alleges Hartley, Young, Trumble, and Gerencser slammed Plaintiff's head into the wall "causing extreme pain in his head and neck," and then slammed him face first into the ground (*Id.* at ¶¶18-19). Young then slammed his

knee into Plaintiff's neck and Hartley used his radio to hit Plaintiff in the face. (*Id.* at ¶¶21-20, 23). Plaintiff alleges Defendants used force even though he was not resisting. (*Id.* at 11, ¶22).

Plaintiff further alleges Grimm, Perkins, and Coates attempted to break his ankles with the shackles. (*Id.* at ¶25). Trumble then jumped over everyone and knelt in front of Plaintiff to cover his mouth and nose to suffocate him. (*Id.* at ¶27). According to Plaintiff, at the same time Trumble was in front of him trying to suffocate Plaintiff, Trumble was also helping Young, Hartley, Gerencser pull the waist chain and bend his wrist backwards in attempt to break Plaintiff's wrist. (*Id.* at ¶29). The force ceased when Young grabbed Plaintiff's by the neck and with the assistance of Gerencser, Hartley, and Trumble, dragged Plaintiff into the cell. (*Id.* at ¶23). Plaintiff stated he was not on his medications at the time of incident. (*Id.* at 9, ¶9). As a result of the incident, Plaintiff alleges that he "suffered extreme neck pain, scrapes on arms and wrist, ankles and hip," as well mental and emotional distress. (*Id.* at ¶¶12, 34-35).

## STATEMENT OF MATERIAL FACTS

On May 2, 2024, Plaintiff was approved for CM II by State Classification Officer ("SCO") R. Walsingham who then notified staff so Plaintiff could be housed accordingly. (Exh. O at 2). Subsequently, on May 8, 2024, an email was sent out with a list of medical return/diversion CM inmates that were to be rehoused to Main

Unit; Plaintiff was included. (Exh. P). On May 17, 2024, at approximately 1:02 p.m., Grimm was present in K-Dorm at the Annex because Plaintiff was refusing to submit to an unclothed search, hand restraints and exit his cell for a cell re-assignment. (Exh. A at 0:00:20-0:01:02)[1]. Plaintiff received counseling from both corrections and mental health staff to cease his disruptive behavior, but they were unsuccessful. (*Id.* at 0:00:55-0:01:08). Duty Warden was contacted, and the use of chemical agents to subdue the disturbance caused by Plaintiff was authorized. (*Id.* at 0:01:45-0:01:55). Grimm gave Plaintiff a final order to submit to an unclothed search, hand restraints and exit his cell for a cell re-assignment. (*Id.* at 0:02:35-0:02:50). Plaintiff stated that he would comply with orders and asked that the camera accompany his escort to the Main Unit. (*Id.* at 0:03:48-0:03:58).

Afterwards, Plaintiff was placed in full transport restraints which consisted of handcuffs, black box, leg restraints, and a waist chain. (*Id.* at 0:07:20-0:10:50). Once Plaintiff was fully restrained, Hartley, Grimm and White, along with Officer Vega, the camera operator, proceeded to escort Plaintiff to E-Dorm. (*Id.* at 0:11:15; Exh. G, Bates# 1141). Hartley maintained a custodial hold on Plaintiff's left side for the entire duration of the escort; Hartley's radio can be seen holstered on his left side next to a K5 canister. (Exh. A at 0:11:07).

---

[1]This refers to 0 hours 00 minutes 00 seconds on the escort handheld video through 0 hours 23 minutes 35 seconds. (Exhibit A - Escort Handheld Video).

Three minutes into the escort, Plaintiff began making comments directed at the camera. (*Id.* at 0:14:22). As the escort continued, Plaintiff's behavior became more disruptive – he started shouting that correctional officers at the Main Unit were plotting to kill him. (*Id.* at 0:18:10-0:20:50). Plaintiff also yelled about a lawsuit he filed against correctional officers at the Main Unit. (*Id.*) At one point, the escort encountered Lieutenant Cody Cattnach, a defendant in Plaintiff's previous lawsuit. (*Id.* at 0:19:33-0:19:50). Prior to arriving at E-Dorm, Young joined the escort. (*Id.* at 0:20:30). As they neared E-Dorm, Plaintiff's behavior became more disruptive, shouting at officers: "Fuckboi you hear me?" (0:21:45) and "I want y'all to fuck me up. Telling you I'm going to get some of y'all jobs this time!" (*Id.* at 0:22:10-0:22:14). Throughout the escort, Defendants calmly ordered Plaintiff multiple times to cease his disruptive behavior. (Ex. A).

Eleven minutes after exiting K-Dorm, the escort arrived at E-Dorm. (*Id.* at 0:22:48). Prior to going inside the building, Plaintiff started shouting that he "isn't going into a cell with nobody." (*Id.* at 0:22:50). The escort consisting of Plaintiff, Hartley, Grimm, White, Young and Vega entered E-Dorm at approximately 1:24 p.m. (Exh. B at 0:00:21)[2]. As Hartley and Young continue to escort Plaintiff towards cell E-2102, Plaintiff continued to shout that he was not going inside the cell. (Exh.

---

[2]This refers to 0 hours 00 minutes 00 seconds on the Front Door fixed wing video through 0 hours 1 minutes 17 seconds. (Exhibit B – Front Door Fixed Wing Video).

A at 0:22:57-0:23:20). However, the camera operator failed to keep the camera on Plaintiff. (*Id.* at 0:23:17). Instead, the camera was turned to White, who, with Grimm present, gave a closing statement while Plaintiff was yelling in the background. (*Id.* at 0:23:20-0:23:35).

Although the handheld camera does not show the beginning of the use of force, a fixed wing camera captured the entirety of the incident. (Exh. C) [3]. Fixed wing video evidence shows that Plaintiff began pulling away from Hartley's custodial hold in front of cell E-2102 in violation of Hartley's orders to enter the cell. (Exh. C at 0:00:14-0:00:24; Exh. D at 0:00:14-0:00:24[4]). Plaintiff can be seen leaning away from Defendants, bracing his body and holding on to the staircase. (Exh. C at 0:00:17-0:00:24; Exh. D at 0:00:14-0:00:24). In his deposition, Plaintiff acknowledges that he refused to comply with lawful commands, "I said no, I'm not going in the cell. So I held the rail, and … I was kind of leaning away from them…." (Exh. H at 11:25-12:1-3). Defendants proceeded to use forward pushing force on Plaintiff. (Exh. C at 0:00:17-0:00:24). Defendants' use of force overcomes Plaintiff's resistance, and they are propelled forward. (*Id.* at 0:00:24-0:0025).

---

[3]This refers to 0 hours 00 minutes 00 seconds on the W2 Control fixed wing video through 0 hours 14 minutes 35 seconds. (Exhibit C – W2 Control Fixed Wing Video).

[4]This refers to 0 hours 00 minutes 00 seconds on the W2 Dayroom fixed wing video through 0 hours 14 minutes 25 seconds. (Exhibit D – W2 Dayroom Fixed Wing Video).

Defendants continue to struggle to bring Plaintiff into compliance and Plaintiff is held against the wall. (*Id.* at 0:00:26-0:00:33). At this time, the door to cell E-2102 is opened. (*Id.* at 0:00:29). Defendants and Plaintiff come off the wall, but Plaintiff continues to resist. (*Id.* at 0:00:34-0:00:44). Plaintiff then drops his body weights and drags down Defendants with him. (*Id.* at 0:00:45-0:00:49). Defendants applied downward pressure on Plaintiff to keep him on the ground while they collectively removed his transport restraints. (*Id.* at 0:00:52). Defendant Gerencser removes the leg restraints and places them on the staircase platform. (*Id.* at 0:01:11-0:01:13). The other Defendants continue removing the rest of the restraints. *Id.*

White directs Officer Vega to get closer to the cell door. (*Id.* at 0:01:24). Officer Vega starts recording using the handheld camera and White conducts the opening statement. (*Id.* at 0:01:34; Exh. E at 0:00:01-0:00:16). Defendants are seen on the handheld video applying downward pressure on Plaintiff while they remove his restraints. (Exh. E at 0:00:25). Hartley and Young maintained downward pressure on Plaintiff's upper torso while Perkins and Gerencser applied downward pressure on Plaintiff's legs. (*Id.*; Exh. G, Bates # 1129-1148). Trumble and Coates continued to stand while assisting in the removal of the leg restraints and waist chain. *Id.* Grimm orders Plaintiff to allow Defendants to remove his restraints. (Exh. E at 0:00:18-0:00:20). While Defendants removed his restraints, Plaintiff continued to yell and resist by tensing his body, specifically his arms, impeding the Defendants'

efforts to remove the waist chain. (Exh. E at 0:00:27-0:00:44). Grimm ordered Plaintiff to stop resisting, "inmate Lee allow them to take off your restraints and you can be placed in the cell. That's all we want to do." (*Id.* at 0:00:38). But Plaintiff refused to comply and continued to resist on the ground. (*Id.*) Defendants continue to remove the waist chain. (*Id.* at 0:01:08). The waist chain is eventually removed, and Gerencser hands it over to Grimm. (*Id.* at 0:01:13). Next, Gerencser hands over the black box. (*Id.* at 0:01:15). Once the black box, leg restraints, and waist chain were removed, Defendants immediately stopped applying downward pressure and collectively lifted Plaintiff and placed him inside his new cell assignment. (*Id.* at 0:01:17-0:1:24). Hartley and Trumble are the only officers who step fully inside the cell. (*Id.* at 0:1:21-0:01:28). Hartley is out of the handheld camera's view for only six (6) seconds. (*Id.*) The video evidence establishes that the use of force lasted approximately three minutes, and Plaintiff was immediately placed inside his assigned cell once his transport restraints were removed. (Exh. C at 0:00:15-0:03:17).

After Plaintiff was secured in his new cell assignment, Defendants ordered inmate Cooks, the inmate already housed in the cell, to come to the door and relinquish his handcuffs which he did. (*Id.* at 0:01:34-0:01:55; Exh. G, Bates# 1145). Defendants then ordered Plaintiff to come to the door and relinquish his handcuffs but Plaintiff refused. (*Id.* at 0:01:55-0:02:12). White then directed Defendants to

place handcuffs back on inmate Cooks. (*Id.* at 0:02:16-0:02:36). Defendants, except for Grimm, leave the area. (*Id.* at 2:47).

Medical staff was brought to Plaintiff's cell and asked Plaintiff if he had any injuries. (*Id.* at 0:07:34). On the handheld video, Plaintiff does not alleged any injuries when interacting with the nurse but he does declare a psychological emergency. (*Id.* at 0:07:34-0:09:05). Plaintiff's medical records show that that nurse noted that Plaintiff complained about pain in left wrist, but she did not observe any swelling or redness at the site. (Exh. I at 2, ¶11, Bates# FDC 262). Additionally, the nurse completed a Diagram of Injury at 1:34 p.m., in which she stated that no injuries were observed or reported at the time of the examination. (Id. at ¶12, Bates# FDC 253). White asks Plaintiff if he would relinquish his handcuffs so medical can do an anterior and posterior check for injuries, and Plaintiff refused. (*Id.* at 0:08:45-0:09:05). After the use of force, Plaintiff was kept in view of the handheld camera and can be observed on the video. (*Id.* at 0:03:91-0:10:00). Plaintiff declared a psychological emergency which was honored after the conclusion of the incident. (Exh. I at 2, ¶13, Bates# FDC 259).

## MEMORANDUM OF LAW

### Standard for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

At bottom, the summary judgment question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. When answering that question, courts view the evidence in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). And the "non-moving party . . . bears the burden of coming forward with sufficient evidence on each element that must be proved." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

The video evidence controls over any of Plaintiff's contradictory assertions. "Where the video obviously contradicts Plaintiff's version of the facts, we accept the video's depiction instead of Plaintiff's account." *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010); *see also Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L.Ed.2d 686 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonably jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). "If the non-movant's evidence is so

thoroughly discredited by the rest of the record evidence that no reasonable jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination." *Lord v. Allstate Ins. Co.*, 47 F.Supp.3d 1288, 1291 (N.D. Ala. 2014) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## I.  **Plaintiff cannot prove a constitutional violation against Defendants.**

Defendants are entitled to summary judgment because Plaintiff cannot prove that the Defendants utilized excessive force or that they failed to intervene. The video evidence shows that the Defendants did not utilize excessive or unnecessary force against Plaintiff. Reactionary force was properly utilized by Defendants due to Plaintiff's disruptive behavior.

### A. Defendants are entitled to summary judgment because Plaintiff cannot prove that they utilized excessive force.

The Eighth Amendment, which applies to the states through the Fourteenth Amendment, can give rise to claims challenging the excessive use of force. *Thomas v. Bryant*, 614 F.3d 1288, 1305 (11th Cir.2010) (reviewing categories of claims under the Eighth Amendment). An excessive-force claim requires a two-prong showing: (1) an objective showing of deprivation or injury that is "sufficiently serious" to constitute a denial of the "minimal civilized measure of life's necessities"; and, (2) a subjective showing that the official had a "sufficiently culpable state of mind." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994) (other citations omitted)). It is the "unnecessary and wanton

infliction of pain" caused by force used "maliciously and sadistically" for the very purpose of causing harm that constitutes cruel and unusual punishment. *Whitley v. Albers*, 475 U.S. 312, 322, 106 S. Ct. 1078, 89 L.Ed.2d 251 (1986). Thus, where an Eighth Amendment claim is based upon allegations of excessive force, the question turns on whether the prison guard's "force was applied in a good faith effort to maintain or restore discipline or maliciously or sadistically for the very purpose of causing harm." *Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir. 2005).

To determine whether force was applied "maliciously and sadistically," courts consider the following factors: "(1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them." *Campbell v. Sikes*, 169 F.3d 1353, 1375 (11th Cir. 1999) (quotations and citations omitted). When considering these factors, the courts "give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance." *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007) (citations omitted).

Moreover, in the context of prison discipline, a distinction is made between "punishment after the fact and immediate coercive measures necessary to restore

order or security." *Ort v. White*, 813 F.2d 318, 324–25 (11th Cir. 1987). When a prison's internal safety is of concern, courts conduct a more deferential review of the prison officials' actions. *Williams v. Burton*, 943 F.2d 1572, 1575 (11th Cir. 1991) (citations omitted). Indeed, "[t]hat deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches in prison discipline." *Whitley*, 475 U.S. at 322; *see also Bell v. Wolfish*, 441 U.S. 520, 547, 99 S. Ct. 1861, 60 L.Ed.2d 447 (1979).

The undisputed material facts establish that the Defendants Coates, Gerencser, Hartley, Perkins, Trumble, and Young did not act intentionally to cause harm to Plaintiff. Additionally, Grimm did not use any force against Plaintiff. (Exh. G, Bates# 1143; Exh. C and E; Ex. H at 22:22-22:24; 36:4-36:7). There is no dispute that force was used on Plaintiff, and the Parties agree that force was used only after Plaintiff physically and verbally refused comply with Hartley's lawful command directing Plaintiff to enter his new cell assignment. Thus, Defendants were justified in using physical force to subdue Plaintiff after Plaintiff refused to obey orders and became physically resistance. Officers within the State of Florida are authorized to use force against individuals in such a situation. *See e.g.* § 944.35, Fla. Stat. ("An employee of the department is authorized to apply physical force upon an inmate only and to the extent that it reasonably appears necessary: 4. To quell a disturbance;

[or] 5. To overcome physical resistance to a lawful command."); § 33-602.210, Fla. Admin. Code (describing how and when force can be applied).

When considering the use of force, "we examine the facts as reasonably perceived by [defendants] on the basis of the facts known to [them] at the time. *Fennell v. Gilstrap*, 559 F. 3d 1212, 1217 (11th Cir. 2009); *see also*, *Whitley*, 475 U.S. at 321. The force utilized by Defendants to gain Plaintiff's compliance could not be considered malicious and sadistic. Plaintiff's concession that he refused to comply with Defendants' lawful commands supports Defendants' contention that there was a need for force. Two orders (enter the cell and relinquish his restraints) were given and ignored. The force came in the form of applying forward pushing force to direct Plaintiff towards the cell, downward pressure to remove his transport restraints, and upward force to place him inside the cell. (Exh. E; Exh. G, Bates# 1129-1147). No other force was used by Defendants. *Id.*

Despite the incident being avoidable, Plaintiff acknowledges that he did not comply with Hartley's order to enter his new cell assignment. (Ex. H at 11:25-12:1-3; Doc. 11 at 10, ¶17). Plaintiff admits that he verbally and physically refused to comply with lawful orders, "I said no, I'm not going in the cell. So I held the rail, and … I was kind of leaning away from them…." (Ex. H at 11:25-12:1-3). Plaintiff alleges that Defendants "maliciously slammed [his] head into the wall causing extreme pain in his head and neck" as a result of his refusal to enter the cell. (Doc.

11 at 10, ¶17). However, the record demonstrates that Defendants only utilized forward pushing force on Plaintiff after Plaintiff pulled away from Defendants, braced his body and held on to the staircase. (Exh. C at 0:00:14-0:00:24; Exh. D at 0:00:14-0:00:24; Exh. G, Bates# 1129-1147). Thus, Defendants were justified in using force to place Plaintiff against the wall to maintain control of Plaintiff. *Id.*

Plaintiff was ordered by Grimm to stop physically resisting and allow Defendants to remove his transport restraints. (Exh. E at 0:00:27-0:00:45). But Plaintiff did not comply. *Id.* Thus, Defendants utilized downward pressure with the objective to remove Plaintiff's leg restraints, waist chain, and black box so he could be placed inside his cell. (Exh. C; Exh. E at 0:00:00-0:01:24; Exh. G, Bates# 1129-1147). Once Plaintiff was left with only his handcuffs on, Defendants immediately and collectively placed Plaintiff inside his cell and all force ceased. (Exh. E at 0:01:16). From the time Plaintiff held on to the staircase, to the time Plaintiff was placed inside the cell was approximately three (3) minutes. (Exh. C at 0:00:15-0:03:17).

The evidence shows that the amount of forced used was minimal. *De minimis* force, even if it appears unnecessary, does not violate the Eight Amendment, provided the force is not "repugnant to the conscience of mankind." *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992). The amount of force, the extent of injuries inflicted and the efforts to temper the severity of the force all support the Defendants'

assertion that only reasonable *de minimis* force necessary to overcome Plaintiff's non-compliance was used. The Defendants tempered the severity of the force used as it was proportional to the need to secure the Plaintiff. Furthermore, medical arrived minutes later and Plaintiff was evaluated cell. (Exh. E at 0:07:35) Notably, Plaintiff refused to relinquish his handcuffs in order for medical to do an anterior and posterior examination of Plaintiff's body. (*Id.* at 0:08:47). Medical documented that Plaintiff only complained about pain in his left wrist but the nurse observed no swelling or redness and no medical treatment was necessary. (Exh. I at 2, ¶¶9-12, Bates# FDC 261-264, FDC 253).

To the extent that Plaintiff claims that Defendants utilized excessive force, this contention is contradicted by video evidence and his medical records which demonstrate that Defendants used minimal force to hold Plaintiff down to the degree necessary to remove the transport restraints. (Exh. C-E, G, I). The video evidence shows no unnecessary force utilized on Plaintiff – no Defendant used their radio to hit Plaintiff in the face, no knees are placed on Plaintiff's neck, and no Defendant attempted to break Plaintiff's ankles and wrists. (Exh. C and E). Accordingly, because the record evidence is consistent with a lawful use of force, Plaintiff cannot prove a constitutional violation via an excessive use of force and Defendants are entitled to summary judgment in their favor.

**B. Defendants are entitled to summary judgment because there is no evidence that they failed to intervene.**

Plaintiff also brings a claim against all eight Defendants for failure to intervene in the use of force incidents thereby violating Plaintiff's Eighth Amendment rights. To survive summary judgment, Plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation. *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995). Merely negligent failure to protect an inmate from attack does not justify liability under section 1983 . . . the known risk of injury must be a strong likelihood, rather than a mere possibility before a guard's failure to act can constitute deliberate indifference. *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990). Further, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The first element, a substantial risk of serious harm, is evaluated using an objective standard. *Brooks v. Warden*, --- F.3d ----, 2015 WL 5157339 at *4 (11th Cir. Sep. 3, 2015). There must be a "strong likelihood" of injury, "rather than a mere possibility," before an official's failure to act can constitute deliberate indifference. *Id.*

However, as demonstrated by the video evidence, and discussed *supra.*, Defendants did not utilize excessive force. Therefore, Defendants were never in a

position to intervene on Plaintiff's behalf. Because Plaintiff cannot prove excessive use of force as described above, he cannot establish failure to intervene. *See Mobley v. Palm Beach Cty. Sheriff's Dep't*, 783 F.3d 1347, 1357 (11th Cir. 2015) (finding summary judgment is appropriate on a failure to intervene claim when no excessive force was used, because "a police officer has no duty to intervene in another officer's use of force when that use of force is not excessive."); *Crenshaw v. Lister*, 556 F.3d 1283, 1293-94 (11th Cir. 2009). Moreover, Grimm attempted to de-escalate and control the situation by giving Plaintiff multiple orders to relinquish his restraints. Because there was nothing other than necessary and lawful utilization of force, Plaintiff cannot prove a claim for failure to intervene. Thus, Defendants are entitled to summary judgment in their favor.

## II. Defendants are entitled to qualified immunity.

Defendants are entitled to qualified immunity as they did not violate Plaintiff's constitutional rights, and further, Defendants did not violate any "clearly established law." Qualified immunity offers complete protection for government officials sued in their individual capacities who act within their discretionary authority. *Pearson v. Callahan*, 555 U.S. 223 (2009). Officials are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (January 22, 2018) (citing

*Reichie*, 566 U.S. at 664). Courts are not required to address the two prongs of this test in any particular order. *Pearson*, 555 U.S. 223.

"'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *Wesby*, 138 S. Ct. at 589 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). *See also Santana v. Miami-Dade County*, 688 Fed. App'x 763, 770 (11th Cir. 2017) (stating that the circumstances must be viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 hindsight. [While] allow[ing] for the fact that officers are required to make 'split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in particular situation.") In other words, existing law must have placed the constitutionality of the officer's conduct "beyond debate." *Wesby*, 138 S. Ct. at 589 (citing *al-Kidd*, 563 U.S. at 741). The "demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Wesby*, 138 S. Ct. at 589 (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Wesby*, 138 S. Ct. at 589. "The rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *Id*. (internal citations removed). "It is not enough that the rule is suggested by then-existing precedent." *Id*. "The precedent

must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id*. "Otherwise, the rule is not one that 'every reasonable official' would know." *Id*.

Furthermore, when considering a defense of qualified immunity, courts must only consider the facts that were knowable to the Defendants. *White v. Pauly*, 137 S. Ct. 548, 550 (2017). The United States Supreme Court has recently reversed lower courts in several decisions, and in each decision the Court has expressed the concern that clearly established law should not be defined "at a high level of generality." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). The dispositive question is "whether the violative nature of *particular* conduct is clearly established." *Id*. (citing *al-Kidd*, 563 U.S. 731 at 741 (2011)). *See e.g. Mullenix*, 136 S. Ct. 305 (The United States Supreme Court determined that an officer had acted reasonably under circumstances involving a clear violation of the general rule that deadly force may not be used "against a fleeing felon who does not pose a significant threat of harm to the officer or others."). "The clearly established law must be 'particularized to the facts of the case. Otherwise, 'plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White*, 137 S. Ct. at 552.

Here, Defendants did not violate Plaintiff's constitutional rights. *See* Section I, *supra*.

Alternatively, if this Court somehow finds that Defendant's actions constituted a constitutional violation, there has not been a violation of "clearly established law" which would allow for liability. Under Florida law a correctional officer is entitled to apply physical force upon an inmate when and to the extent that it reasonably appears necessary to overcome an inmate's physical resistance to a lawful command. See § 944.35(1)(a)(1), Fla. Stat. *See e.g.* § 944.35, Fla. Stat. ("An employee of the department is authorized to apply physical force upon an inmate only and to the extent that it reasonably appears necessary: 4. To quell a disturbance; [or] 5. To overcome physical resistance to a lawful command."); § 33-602.210, Fla. Admin. Code (describing how and when force can be applied). There is no legal requirement which would demonstrate that the actions of the officers were anything but reasonable.

In an Opinion issued by the United States Supreme Court, the Court overturned a decision by the DC Circuit Court which found that the officers in the case were not entitled to qualified immunity. *Wesby*, 138 S. Ct. 577. In the case, the Court addressed the decision by the DC Circuit[5] and specifically stated that "[e]ven assuming the officers lacked actual probable cause to arrest the partygoers, the

---

[5] Prior to reaching the Qualified Immunity issue, a majority of the Court found that probable cause did in fact exist and that the Appellate Court had made an incorrect finding. However, even though the probable cause issue would have resolved the case, the Court specifically addressed Qualified Immunity due to the clearly erroneous ruling on the issue by the DC Circuit. *See Wesby*, 138 S. Ct. at 589.

officers are entitled to qualified immunity because they 'reasonably but mistakenly conclude[d] that probable cause [wa]s present.'" *Id*. at 591. In making such a finding, the Court belied the fact that there was not "a single precedent – much less a controlling case or robust consensus of cases – finding a Fourth Amendment violation 'under similar circumstances.'" *Id*. And the Court went on to say that the case was not an "'obvious case' where a 'body of relevant case law' is not needed." *Id*. After making such a finding, the Court overturned a judgment of nearly $1 million against the officers. *Id*.

Like in *Wesby*, even if Defendants were mistaken in their perceptions, Defendants would still be entitled to qualified immunity. There is not a "controlling or robust consensus of cases" demonstrating the unlawfulness of Defendants' actions. *Wesby*, 138 S. Ct. at 591. Nor is there an "obvious case" which would demonstrate such a precedent. *Id*. at 591. In fact, based on Florida statutory law, and decisions from this Court, the 11th Circuit, and the U.S. Supreme Court, there would seem to be a "controlling or robust consensus of cases" demonstrating that the officer's actions were in fact lawful. As a result, Defendant should be entitled to Qualified Immunity.

## III.    Plaintiff is not entitled to compensatory damages.

Plaintiff fails to state a claim which would entitle him to compensatory damages because he fails to state a physical injury which is greater than *de minimis*.

As such, Plaintiff's request for compensatory damages from Defendants must be dismissed pursuant to 42 U.S.C § 1997e(e). The Prison Litigation Reform Act ("PLRA") provides that a prisoner may not bring an action "for mental or emotional injury suffered while in custody without a prior showing of physical injury or commission of a sexual act." 42 U.S.C. § 1997e(e). Section 1997e(e) is an affirmative defense – not a jurisdictional limitation – and the district court may *sua sponte* dismiss a claim where the allegations show that this defense would bar recovery. *Douglas v. Yates*, 535 F. 3d 1316, 1320-21 (11th Cir. 2008). Per well-established precedent in this circuit, more than a *de minimis* physical injury is needed to satisfy the requirements of § 1997e(e). *Harris v. Garner*, 190 F.3d 1279, 1286-87 (11th Cir.), vacated, 197 F. 3d 1059 (11th Cir. 1999), reinstated in relevant part, 216 F. 3d 970, 972, 985 (11th Cir. 2000) (en banc). While the phrase "greater than *de minimis*" has not been clearly defined, the court has held that the injury need not be significant. *Id.* at 1286. However, "routine discomfort is part of the penalty that criminal offenders pay for their offenses against society." *Id.* (quotations omitted).

The Eleventh Circuit is in accord that, under 42 U.S.C. § 1997e(e), compensatory damages are unavailable absent physical injury. *Al-Amin v. Smith*, 637 F. 3d 1192 (11th Cir. 2011) (holding that "the overall tenor of *Harris* and its progeny, when taken together, unmistakably supports" the conclusion that § 1997e(e) applies to constitutional claims and precludes the recovery of compensatory damages in the

absence of the requisite physical injury; *Smith v. Allen*, 502 F. 3d 1255, 1271 (11th Cir. 2007) (stating that § 1997e(e) precludes an inmate's claims for compensatory damages without a prior showing of physical injury); *Slicker v. Jackson*, 215 F. 3d 1225, 1229 (11th Cir. 2000) ("compensatory damages under § 1983 may be awarded only based on actual injuries caused by the defendant and cannot be presumed or based on the abstract value of the constitutional rights that the defendant violated"). The physical injury requirement applies to all federal claims, including constitutional claims. *Harris v. Garner*, 216 F. 3d 970, 984-85 (11th Cir. 2000).

While 42 U.S.C. § 1997e(e) does not define "physical injury," the Eleventh Circuit has held that to satisfy the statute, the physical injury must be more than minimal but need not be significant. *Daughtry v. Moore*, Slip Copy, 2009 WL 1151858, *5 (S.D. Ala. 2009), citing *Dixon v. Toole*, 225 F. App'x 797, 799 (11th Cir. 2007). *See also Harris v. Garner*, 190 F. 3d 1279, 1286 (11th Cir. 1999), vacated, 197 F. 3d 1059, reinstated in relevant part, 216 F. 3d 970, 972 (11th Cir. 2000) (en banc); *Mitchell v. Horn*, 318 F. 3d 523, 536 (3rd Cir. 2003); *Oliver v. Keller*, 289 F.3d 623, 626-628 (9th Cir. 2002); *Siglar v. Hightower*, 112 F. 3d 191, 193-94 (5th Cir. 1997), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010). In explaining the type of injury which is not barred by 28 U.S.C. § 1997e(e), some courts have proffered the following common-sense approach; "would the injury require or not require a free world person to visit an emergency room, or have a doctor attend

24

to, give an opinion, diagnosis and/or medical treatment for the injury?" *Luong v. Hatt*,

979 F. Supp. 481, 486 (N.D. Tex. 1997) (emphasis added). Stated another way:

> A physical injury is an observable or diagnosable medical condition
> requiring treatment by a medical care professional. It is not a sore
> muscle, an aching back, a scratch, an abrasion, a bruise, etc., which last
> even up to two or three weeks. People in regular and ordinary events
> and activities in their daily lives do not seek medical care for the injuries
> they receive unless it obviously appears to be of a serious nature or
> persists after home remedy care. Thus, the seriousness of the injury
> needed . . . require more than the types and kinds of bruises and
> abrasions about which the Plaintiff complains.

*Talley v. Johnson*, 2008 WL 2223259, *3 (M.D. Ga. 2008) (citing *Luong*). *See also*

*Thompson v. Sec'y, Fla. Dep't of Corr.*, 551 F. App'x. 555, 557 n.3 (11th Cir. 2014)

(per curiam) (unreported op.) (citing *Luong*); *Brown v. McGowan*, 2014 WL

4538056, *7 (N.D. Fla. 2014) (same).

In this case, Plaintiff's medical records indicate that Plaintiff had no injuries

when examined immediately after the use of force incident. (Exh. I at 2, ¶¶9-12, 14-

17, Bates# 253, 257-258, 261-264). Minutes after the incident, Plaintiff received a

post-use-of-force ("PUOF") cell front examination by medical staff who noted that

Plaintiff complained about pain in his left wrist but observed no swelling or redness

at the site. Plaintiff required no medical treatment. (*Id.* at 2, ¶¶9-12, Bates# FDC 253,

261-264). A Diagram of Injury was completed at the same time, and it was

documented that no injuries were observed or reported. (*Id.* at Bates# FDC 253).

Plaintiff was seen by medical again two hours after the initial cell front examination.

(Id. at 3, ¶14, Bates# FDC 258). The nurse noted that Plaintiff showed no signs or symptoms of distress and was able to make his needs known. *Id.* Four hours after the initial examination, Plaintiff was seen a third time, and it was documented that Plaintiff, for the first time, reported that security had stepped on his neck and that he had fallen on his head. (Id. at 3, ¶15, Bates# FDC 257). However, the nurse noted that Plaintiff was not showing signs or symptoms of distress. *Id.* Also, the handheld video shows that Plaintiff did not have any physical injuries and never mentioned any neck or head injury to the nurse who performed his POUF examination. (Exh. E at 0:07:34-0:09:00). Notably, Plaintiff refused to relinquish his handcuffs in order for medical to conduct an anterior and posterior examination of his body. (*Id.* at 0:08:47).

The Amended Complaint describes Plaintiff's injuries as scrapes on arms, wrist, ankles, and hip, and "extreme neck pain" without providing any more detail about the extent of his injuries. (Doc. 11 at 12). During Plaintiff's deposition, Plaintiff describes his injuries as "bad neck pain. Like, my wrists had bad bruises on it, … little scrapes. Just kind of sore for a couple of days or whatever. I didn't say anything about my back, but my back had already been messed up from the longest since last incident … but it hurts worse." (Exh. H at 27:2-27:7). Plaintiff also claimed mental injuries, "Mentally … they messed me up even worse." *Id.* at 27:8.

A review of Plaintiff's medical records demonstrates that he did not have any injuries on May 17, 2024. (Exh. I at 2-3, ¶¶11-17). Moreover, in reviewing Plaintiff's

medical records even further, Plaintiff was medically assessed on May 23, 2024, June 6, 2024, June 12, 2024, after complaining about neck pain. (Exh. I at 3-4, ¶¶19-24; Bates# FDC 234-236, 242-243, 245, 247-248). However, in all three medical visits, it was documented that revealed that he had no injuries – his bilateral arms and wrists had no deformities, bruising or swelling. *Id.* His arms and wrists had full range of motion. Plaintiff's back was examined and no deformity, swelling, or bruising was noted nor was any pain elicited during the examination. *Id.* For each visit, Plaintiff's neck was examined, and each time it was documented that Plaintiff had full range of motion, and no swelling, bruising, or deformity were noted. *Id.* Notably, no pain was elicited during the examinations of his neck, yet Plaintiff requested pain medication above the prescribed limits. *Id.* at 4, ¶24, Bates# FDC 235-236).

The May 23, 2024, evaluating nurse documented that Plaintiff's self-reported symptoms suggested mild sternocleidomastoid muscular pain from muscle strain. (*Id.* at 3-4, ¶20, Bates# FDC 247-248). The nurse on June 3, 2024, noted that Plaintiff's symptoms were consistent with possible torticollis, and he was given an injection of Solumedrol. (*Id.* at 4, ¶22. Bates# 242-243). A cervical spine X-ray was ordered and performed on June 19, 2024. (Id. at 4, ¶¶24-25, Bates# FDC 231-232, 235-236). The X-ray showed no acute fracture, dislocation or destructive bony process. Additionally, no osseus or soft tissue abnormality was noted. *Id.*

Plaintiff did not complain about neck pain again until November 13, 2024. (*Id.* at 4, ¶¶26-27, Bates# 171). Plaintiff was seen by medical on November 15, 2024, and APRN documented a spasm to Plaintiff's left trapezius and painful rotation of neck. (Id. at 5, ¶29, Bates# FDC 126-129). The APRN diagnosed torticollis and ordered a trial of Flexeril. *Id.* November 15, 2024, was the last time Plaintiff complained about neck pain. (*Id.* at 5, ¶30; Exh. J). Aside from Plaintiff's self-reported complaints of neck pain, there is no objective evidence Plaintiff suffered more than a *de minimis* injury to his neck.

Additionally, given Plaintiff's self-described medical history of back pain and scant or entirely absent references, by him or examiner, of the purported injuries suffered, Plaintiff has not sufficiently established a causal connection between the medical conditions he has previously and currently suffers from and any injuries that may potentially stem from the incident. Only an expert witness is competent to distinguish between the ailments Plaintiff suffered from before and after the alleged incident.

> Without medical expert testimony, it is not possible to distinguish between the ailments Rivera experienced before the fall and those she experienced after—and due to—the fall. Further, due to the nature of the injuries that she alleges— including, for example, back pain, depression, anxiety, and vision issues—expert testimony is simply required in order to even understand the nature and extent of the injuries.

*Rivera v. Royal Caribbean Cruises Ltd.*, 711 Fed. Appx. 952, 955 (11th Cir. 2017)

(affirming summary judgment in favor of defendant because plaintiff failed to present medical expert testimony to distinguish between ailments she experienced before and after incident at issue). "When the causal link between the alleged injuries and the incident at issue is not readily apparent to a lay person, expert medical testimony as to causation is typically required." *Rivera v. Royal Caribbean Ltd.*, 711 F. App'x 952, 954 (11th Cir. 2017); *see also Willis v. Royal Caribbean Cruises, Ltd.*, 77 F.4th 1332, 1338 (11th Cir. 2023). Plaintiff has not offered expert medical testimony to establish causation based on the alleged incident, as opposed to his medical history of pre-existing conditions.

The only other injuries claimed are alleged mental ones, thus, Plaintiff's injuries are the definition of *de minimis* injury. *Tate v. Rockford*, 497 F. App'x 921, 925 (11th Cir. 2012) (unreported op.) (holding that "a laceration on [a prisoner's] forehead, several small abrasions and cuts, and a swollen right eye" are *de minimis* injuries); *Dixon v. Toole*, 225 F. App'x 797, 799 (11th Cir. 2007) (unreported op.) (bruising is only a *de minimis* injury, insufficient to satisfy the physical injury requirement of 42 U.S.C. § 1997e(e)); *Wineston v. Pack*, 2009 WL 3126252 (N.D. Fla. 2009) (finding a minor contusion to the forehead with minimal swelling for which he was given Advil for three days was de minimis); *Radford v. Johnson*, 2006 WL 2927578 (M.D. Ga. 2006) (allegation of sore shoulder, sore abdomen, and swelling of face are, at most, de minimis and insufficient to prove physical injury to

support allegation of excessive force).

Lacerations and scrapes are insufficient injuries for recovery. *See e.g. Cain v. Commonwealth of Va.*, 982 F. Supp. 1132, 1135 & n. 3 (E.D. Va. 1997) (unbearable headaches, vision loss, numbness in arms and legs, joint pain, stomach cramps, lower back pain, and blackouts were not a sufficient physical injury to recover under § 1997e(e) for mental injury); *Quinlan v. Pers. Transp. Servs. Co.*, 329 F. App'x 246, 249 (11th Cir. 2009) (complaints of temporary chest pain, headache, difficulty breathing, and back pain which did not require immediate medical attention were de minimis and insufficient to surmount § 1997e's bar. *See also Ledlow v. Givens*, Slip Copy, 2012 WL 6176471 at *3 (11th Cir. 2012) (finding that a bloody nose and a two-centimeter laceration requiring six sutures were de minimis injuries); *Mann v. McNeil*, 360 F. App'x 31, 32 (11th Cir. 2010) (unreported op.) (scrapes and marks on knees and legs were the type of injuries barred by §1997e(e)); *Harris*, 190 F. 3d at 1286 87 (finding that a "dry shave" – shaving with an unlubricated razor – was not the kind of physical injury cognizable under § 1997e(e)); *Daughtry v. Moore*, No. 08-00215-KD-C, 2009 WL 1151858, *5 (S.D. Ala. Apr. 27, 2009) (bumps on neck and shoulders insufficient to satisfy the physical injury requirement of § 1997e(e)). Temporary pain and bruising are also characterized as *de minimis*. *Tate*, 497 F. App'x at 925; *Quinlan*, 329 F. App'x at 249; *Dixon*, 225 F. App'x at 799; *Nolin v. Isbell*, 207 F. 3d 1253, 1258 n.4 (11th Cir. 2000); *Siglar*, 112 F. 3d at 193 94 (sore, bruised

ear type of injury barred by § 1997e(e)); *Luong*, 979 F. Supp. at 485-86 (bruises and abrasions barred by § 1997e(e)).

In this case, Plaintiff's request for relief includes compensatory damages. (Doc. 11). Based on § 1997e(e), and *Harris* and its progeny, Plaintiff is not entitled to any claim for compensatory based on his Amended Complaint as he does not allege a sufficient physical injury. Plaintiff is barred from recovery of such damages by § 1997e(e), and the interpretation of the statute by *Harris* and its progeny. *See* 42 U.S.C. § 1997e(e); *Harris*, 190 F.3d 1279; *Al-Amin v. Smith*, 637 F.3d at 1197-98; *Fraizer*, 264 Fed. Appx. at 815. As a result, based on Plaintiff's injuries not being greater than *de minimis* in nature, Plaintiff is not entitled to any damages as he has not requested any other cognizable relief.

## IV.    The Plaintiff's request for punitive damages must be dismissed because they are statutorily barred.

Punitive damages are statutorily barred. "Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. §3626(a)(1)(A). Moreover, to grant prospective relief, the Court must "fin[d] that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* Furthermore, the Court must "give substantial

weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.*

Section 3626(a)(1)(A) applies to punitive damages because "prospective relief" is defined under the statute as "all relief other than compensatory monetary damages." 18 U.S.C. §3626(g)(7); *see also Johnson v. Breeden*, 280 F.3d 1308, 1325 (11th Cir. 2002) (finding that the plain language of the definition provision is clear and that "punitive damages are prospective relief").

As a categorical matter, punitive damages cannot satisfy the strict requirements of section 3626(a)(1)(A). First, punitive damages are never necessary to correct a violation of a federal right. This is because "correction" of violation is accomplished through compensatory damages and punitive damages are, by their nature, never corrective. *See Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001) ("A jury's assessment of the extent of a plaintiff's injury is essentially a factual determination, whereas its imposition of punitive damages is an expression of its moral condemnation.)

Second, even if an award of punitive damages could be thought reasonably "necessary" to correct a legal violation, such an award could not satisfy the additional, stringent limitations imposed by the PLRA—i.e., the requirements that the relief be "narrowly drawn," "extend[] no further than necessary to correct the violation of the Federal right," and be "the least intrusive means necessary to correct

the violation of the Federal right." 18 U.S.C. §3626(a)(1)(A); *see United States v. Whyte*, 928 F.3d 1317, 1328 (11th Cir. 2019) (explaining that it is a "cardinal rule" of statutory interpretation that courts try to give "effect… to every clause… of a statute") (citation and internal quotation marks omitted)). Even if deterring future violations is conceptualized as one way of correcting a violation, punitive damages are never the "narrow[est]" or "least intrusive" way of effectuating such a correction. As the Supreme Court has explained, "[d]eterrence is… an important purpose of" the tort system created by section 1983, but such deterrence primarily "operates through the mechanism of damages that are compensatory—damages grounded in determinations of plaintiffs' actual losses." *Memphis Cnty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (emphasis in original). Similarly, the Supreme Court has made "clear" that "nominal damages," not punitive damages, "are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury." *Id.* at 308 n.11. Even assuming punitive damages are also an "appropriate" means of vindicating such rights, they are not less burdensome, more narrowly tailored, or less intrusive than nominal damages.

Although the Eleventh Circuit held in *Hoever v. Marks*, 993 F.3d 1353, 1364 (11th Cir. 2021), that "[42 U.S.C.] §1997e(e) permits claims for punitive damages without a physical injury requirement," it expressly declined to consider whether section 3626 bars punitive damages. *Id.* at 1364 fn. 5. Because the Court did not

consider the argument presented here, *Hoever* is not controlling on the issue. Moreover, in *Johnson v. Breeden*, 280 F.3d 1308, 1325-26 (11th Cir. 2002), the Eleventh Circuit interpreted section 3626(a)(1)(A) in a manner that indicates that it does not bar punitive damages. However, the argument that section 3626 categorically bars punitive damages was not discussed, let alone rejected, in *Johnson*. Therefore, *Johnson* is not dispositive on the issue.[6] *See United States v. Mitchell*, 271 U.S. 9, 14 (1926) ("It is not to be thought that a question not raised by counsel or discussed in the opinion of the court has been decided merely because it existed in the record and might have been raised and considered."); *Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

The Circuit Courts apparently have yet to directly address whether punitive damages are barred by section 3626. *See*, *e.g.*, *Hoever*, 993 F.3d at 1364 n.5 ("We decline the government's invitation to address the availability of punitive damages in prison condition cases under 18 U.S.C. § 3626, as it falls outside the scope of the *en banc* briefing question posed to the parties.") (citation omitted); *Al-Amin v. Smith*, 637 F.3d 1192, 1199 n.10 (11th Cir. 2011) ("Since we find that § 1997e(e) prevents

---

[6] To the extent that this Court is bound by *Johnson*, the argument that section 3626 bars punitive damages is presented here to preserve the issue for appellate review.

Al–Amin, in the absence of physical injury, from offering evidence supporting an award of punitive damages in this action, we need not consider the validity or timeliness of Defendants' alternative argument that 18 U.S.C. § 3626 prohibits punitive damage recovery as well."), overruled by *Hoever*, 993 F.3d at 1363-64; *Vaughn v. Cambria Cnty. Prison*, 709 Fed. Appx. 152, 155 n.2 (3d Cir. 2017) ("The Magistrate Judge stated that punitive damages were unavailable under 18 U.S.C. § 3626(a)(1)(A)… We offer no opinion on this issue at this time and defer consideration of it in this proceeding because liability has not yet been found.") (citation omitted); *Wilkerson v. Stalder*, 329 F.3d 431, 434 n.3 (5th Cir. 2003) ("The district court chose to defer ruling on the prison officials' claim that the Prison Litigation Reform Act bars the inmates' claim for punitive damages until such time as liability is found. Therefore, this issue is not properly before the court on appeal.") (citation omitted). Because of the apparent absence of Circuit precedent directly addressing this argument, Defendants rely on the plain meaning of the text of section 3626.

Punitive damages are never "necessary to correct the violation of" a Federal right because, "[i]n the strictest sense of the term, something is 'necessary' only if it is essential." *Ayestas v. Davis*, 138 S. Ct. 1080, 1093 (2018) (citing Webster's Third New International Dictionary 1510 (1993); 10 Oxford English Dictionary 275–276 (2d ed. 1989)); *see also* Necessary, Black's Law Dictionary (11th ed. 2019)

(defining necessary to mean "essential"). And the text and context of section 3626(a) indicate that Congress intended to use the term "necessary" in the strict sense of that word. Unlike the "necessary and proper clause" of Article I, Section 8, for example, section 3626 uses the term "necessary" in the context of a "strict limitation[]," not a broad authorization. *See Johnson*, 280 F.3d at 1323. Similarly, the immediately surrounding text provides that relief is barred unless it is "narrowly drawn," "extends no further than necessary to correct the violation of the Federal right," and is "the least intrusive means necessary to correct the violation of the Federal right. 18 U.S.C. §3626(a)(1).

Punitive damages, however, are not even an appropriate mechanism for "correcting" a legal violation; to the extent that damages serve a "corrective" function, that is what compensatory damages are for. By definition, "compensatory damages" are "[d]amages sufficient in amount to indemnify the injured person for the loss suffered." Damages, Black's Law Dictionary (11th ed. 2019) (emphasis added). Accordingly, punitive damages are not even intended to "correct" a legal violation by making the injured party whole; still less are they an "essential" way of making the plaintiff whole.

Consistent with dictionary definitions, caselaw recognizes that punitive damages awards serve two purposes, "punishing unlawful conduct and deterring its repetition." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003)

36

(quotation omitted). Neither of those purposes makes punitive damages "necessary to correct" a violation of Federal law. By definition, one may "correct" a violation of law without "penalizing" past misconduct or "deterring" potential future violations. Ordinary English usage confirms that proposition. For example, one does not "correct" a future error before it happens; one seeks to deter it—i.e., to prevent it from happening in the first place. Likewise, punishment is not strictly necessary to remedy a wrong; instead, punishment serves other goals, like deterrence or retribution. *Cf. Kokesh v. S.E.C.*, 137 S. Ct. 1635, 1642 (2017) (distinguishing between remedies that are penalties, i.e., those that seek to punish, and those that seek to "compensate[e] a victim for his loss").

Moreover, reading section 3626 to categorically bar punitive damages does not prevent the court from fully remediating ongoing violations. In many civil actions with respect to prison conditions, a plaintiff alleges that his federal rights are being violated on an ongoing basis. In those cases, prospective relief may be warranted—for example, in the form of declaratory or injunctive relief that requires prison officials to "correct" their violation by bringing their conduct into conformity with the law. As this Court has explained, albeit in the context of interpreting section 1997e(e), such relief provides a "reasonably adequate opportunity" to seek redress for constitutional violations," even if prisoners "may not recover monetary damages for such claims." *Al-Amin*, 637 F.3d at 1197 (quotation marks and citation omitted).

37

What is more, to clear the high bar of the PLRA, relief other than compensatory monetary damages must extend "no further than necessary to correct the violation of the Federal right of [the] particular plaintiff or plaintiffs." 18 U.S.C. §3626(a)(1). Punitive damages awards aimed at protecting inmates generally (e.g., through deterrence), rather than correcting the violations suffered by the particular plaintiff bringing the suit, are thus prohibited. Moreover, not only must punitive damages awards be plaintiff-specific, they must be defendant-specific. Section 3626(a)(1) requires that they be "narrowly drawn," which means that any deterrent must be aimed at deterring the particular defendant, not the correctional facility or government in general.

Because this Court cannot find that punitive damages are necessary to correct a violation of Plaintiff's rights or are the least intrusive means necessary to do so, punitive damages are barred by section 3626(a)(1)(A). Therefore, Plaintiff's request for punitive damages must be dismissed.

## CONCLUSION

WHEREFORE, Defendants request that this Court find they are entitled to summary judgment because there are no genuine disputes of material fact. Should this Court find there are disputes of material facts, Defendants request this Court find that compensatory and punitive damages are not available to Plaintiff.

Respectfully submitted,

**JAMES UTHMEIER**
**ATTORNEY GENERAL**

*/s/ Juanita Villalpando*
Juanita Villalpando (FBN 1036083)
ASSISTANT ATTORNEY GENERAL
Office of the Attorney General
Civil Litigation Division
The Capitol, PL-01
Tallahassee, Florida 32399-1050
Juantia.Villalpando@myfloridalegal.com
(850) 414-3300
*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

**I HEREBY CERTIFY** that the above Motion does exceed the 8,000 total word maximum created by N.D. Fla. Loc. R. 7.1(F); however, Defendants have sought leave to exceed the word limit. (Doc. 77).

*/s/ Juanita Villalpando*
Juanita Villalpando

## CERTIFICATE OF SERVICE

I certify that a copy of this *Defendant's Motion for Summary Judgment* was e-filed and served electronically on counsel of record through CM/ECF on October 3, 2025, Central Time.

*/s/ Juantia Villalpando*
Juantia Villapando