1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF FLORIDA
2                         PENSACOLA DIVISION

3

4
     ROBERT SINCLAIR LEE,
5    DC#T15204,

6          Plaintiff,

7    vs.                            Case No: 3:24-CV-321-TKW-HTC

8
     CAPTAIN J. WHITE, ET AL.,
9
           Defendants.
10   _____/

11

12
                          DEPOSITION OF
13                     ROBERT SINCLAIR LEE

14              DATE TAKEN:        APRIL 16, 2025
                TIME:              2:00 - 3:12 P.M.
15              PLACE:             Zoom Videoconference

16

17
        This cause came on to be heard at the time and place
18   aforesaid, when and where the following proceedings were
     reported by:
19

20

21              SAMANTHA ADAMS, Court Reporter
                For the Record Reporting, Inc.
22              519 E. Park Avenue - Suite 4
                Tallahassee, Florida 32308

23

24

25

```
 1   APPEARANCES:

 2
     On behalf of Plaintiff:
 3
     ROBERT SINCLAIR LEE, Pro Se
 4

 5

 6   On behalf of the Defendant(s):

 7   JUANITA VILLALPANDO, ESQ.
     ASSISTANT ATTORNEY GENERAL
 8   OFFICE OF ATTORNEY GENERAL
     The Capitol, Suite Pl-01
 9   Tallahassee, Florida 32399
     Office: (850) 414-3300
10   Email: juanita.villalpando@my floridalegal.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    INDEX TO WITNESS

2  WITNESS                                          PAGE

3     ROBERT SINCLAIR LEE

4        Direct Examination by Ms. Villalpando       4

5                         * * *

6

7     Certificate of Reporter:           -          51

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              Z O O M   P R O C E E D I N G S
 2          THE COURT REPORTER:  Okay, we'll go on the
 3   record.  Today is April 16th.  It is 2:01 p.m. Eastern
 4   Standard Time.  And if, Ms. Villapando, if you want to
 5   put your appearance on the record.
 6          MS. VILLAPANDO:  My name is Juainta
 7   Villapando.  I'm from the office of the Attorney General
 8   representing the defendants.
 9          THE COURT REPORTER:  Okay and I believe we
10   have a notary there with the witness.  If the notary
11   will now swear in the witness.
12             NOTARY:  Okay.
13          [ROBERT SINCLAIR LEE; Sworn.]
14          THE COURT REPORTER:  All right, thank you
15   very much and then we'll give a few moments for the
16   notary to leave the room and if the witness can just let
17   us know when he has exited.
18      Okay, and has the notary exited the room yet?
19          THE WITNESS:  Yes, ma'am.
20          THE COURT REPORTER:  Okay.
21          THE WITNESS:  I'm by myself.
22          THE COURT REPORTER:  Okay.  All right,
23   Counsel, you can proceed.
24          MS. VILLAPANDO:  Okay.
25                DIRECT EXAMINATION
```

1  BY MS. VILLAPANDO:

2      Q.  Okay.  So as I already mentioned, my name is

3  Juanita Villapando.  I'm with the office of Attorney

4  General.  I represent the defendants in the case Robert

5  Sinclair Lee versus Captain White.

6      Now, please state your complete legal name for

7  the record.

8      A.  Robert Sinclair Lee.

9      Q.  Please state your DC number?

10     A.  T15204.

11     Q.  Have you ever used an alias?

12     A.  Yes, ma'am.

13     Q.  What alias, and when did you use it?

14     A.  I don't remember when, but I'm going to say

15  what I did use.  Frank Lee Williams, Frank Davis, Bobby

16  Lee, I think Frank Lee.  I think that's all.  But it was

17  like in 2000, 2001, and 2005.

18     Q.  Okay.  So I'm here today, April 16, 2025, to

19  ask you questions about this case.  The purpose of this

20  deposition is to give you the opportunity to tell me

21  your side of the story as to what happened.

22     Now, have you ever been to deposed before,

23  Mr. Lee?

24     A.  Yes, ma'am.

25     Q.  Okay.  So you know the process, but still,

1    I'm going to go over some instructions so this goes as

2    smoothly as possible.

3            A.  Yes, ma'am.

4            Q.  So please answer the questions verbally as

5    the court reporter cannot record nonverbal answers such

6    as nods.  Speak clearly and slowly to make sure that the

7    court reporter takes down every word that is said.

8             If you do not understand a question, please let

9    me know.  If you need to take a break, such as you need

10   to go to the restroom or something, just tell me and

11   we'll take a break.

12           A.  Yes, ma'am.

13           Q.  Objections can be made but cannot be handled

14   right now.  You must still answer the question, but you

15   can state that you object to the way it is phrased or

16   object to the content.

17            Do you understand that you need to answer -- oh,

18   okay.  Do you understand that you need to answer

19   truthfully the questions I asked you today?

20           A.  Yes, ma'am.

21           Q.  When you answer question, will you provide a

22   complete and full answer?

23           A.  Yes, ma'am.

24           Q.  Is there any reason at all why you will not

25   be able to give a full and complete testimony today?

1          A.  No, ma'am.  I will answer truthfully and
2     correctly.
3          Q.  Okay.  Are you under any medications that
4     would impair your focus or inhibit you from answering
5     today's testimony?
6          A.  No, ma'am.  I'm very focused right now.
7          Q.  Okay, all right.  I'm going to start with
8     some preliminary questions.  When did you enter the
9     department's custody?
10         A.  2008.  February or March 2008.
11         Q.  Okay.  When are you due to be released?
12         A.  I have a life sentence, ma'am.
13         Q.  Okay.  What crime are you currently
14    incarcerated for?
15         A.  Attempted felony murder, attempted robbery,
16    four or five aggravated assaults.
17         Q.  And is this your --
18         A.  What did you say, ma'am?
19         Q.  No, go on.
20         A.  And two other armed robberies.
21         Q.  Okay.  Is this your first time in FDOC
22    custody?
23         A.  It's my third time.
24         Q.  What were your prior convictions?
25         A.  Grand theft auto, fleeing, and looting.

1    Grand theft auto, grand theft auto, possession of a

2    firearm.  And like, 16 or 17 misdemeanors.  I don't

3    recall all of them, but that's what I can remember.

4          Q.   Okay.  Do you have any chronic medical

5    issues?

6          A.   I've got nerve damage in my legs from being

7    shot.

8          Q.   What about any chronic mental health issues?

9          A.   I'm a Psych III.  But I mean, I don't take no

10   medication on that right now.  So, I mean, I'm okay.

11   But I suffer from post-traumatic stress, though.

12         Q.   Okay.  Are your mental health conditions

13   documented?

14         A.   Yes.

15         Q.   Okay.  Right now, do you have any documents

16   with you in front of you?

17         A.   I don't have no documents with me now.

18         Q.   Okay, all right.  So now we're going to talk

19   about the events that transpired and resulted in you

20   filing a civil rights lawsuit.

21          Like I said before, this is the opportunity for

22   you to tell your side of the story.  Now, I understand

23   that some people get emotional when telling their story,

24   but it's important that you speak slowly and clearly so

25   the court reporter can do her job.  Do you understand?

1          A.   Yes, ma'am.

2          Q.   Okay.  Now, can you give me the date of the

3     incident alleged in your complaint?

4          A.   Yes, ma'am.  I remember -- do you want me to

5     tell my story first?

6          Q.   First, just establish when this occurred.

7          A.   May 17, 2024.

8          Q.   And where?

9          A.   Santa Rosa Correction Institution, main unit.

10         Q.   Okay.  Now, you can start from the beginning

11    and tell me what happened on May 17, 2024.

12         A.   Okay.  Around between 11:00 and 12:00, or

13    1:00, Officer Hartley came to my cell and told me that I

14    was getting transferred to the annex and to pack my

15    stuff.  And I told him, I said, well, I can't go over

16    there because I filed a previous lawsuit and the officer

17    still works over there and I'm in fear for my life.

18         So he said, well, I'm just doing my job, but you

19    got to go over there.  I told him to call the captain

20    and call mental health because I need to let them know

21    that I'm in fear for my life.  So, he left.  He came

22    back with the captain, and the captain came back with

23    mental health or whatever.  And I told the mental health

24    about what was going on.

25         And she said, well, I can't do nothing but

1    document it, so security wants you to go over there to

2    the main unit.  That's all I can do is document what you

3    say.  So I told her, now I'm in fear for my life because

4    of what happened and whatnot.  I even explained in

5    detail about what happened.

6          Can I ask you a question, Ms. Villapando --

7    Villapando?  Can I tell you a little bit about that

8    story?  I can't tell nobody --

9          Q.  First -- you can tell me more afterwards, but

10   just tell me right now of the incident that occurred on

11   May the 17th.

12         A.  All right.  So I still refused or whatever

13   because I wanted them to get the camera.  And so, I

14   could talk on camera about what happened previously.  So

15   once the camera came, I said what happened and so forth.

16         And Lieutenant Grimm told me that I had a

17   three-minute delay or whatever, or I would get chemical

18   agents used on me.  So I told him, I would comply once I

19   said what I had to say.  And then they handcuffed me and

20   took me -- they also handcuffed me, and we started going

21   to the main unit on camera.

22         But as we were going to the main unit, I was

23   saying like the stuff that I was scared of.  And you

24   know, the stuff that I felt like was going to happen.

25   And they kept telling me, stop being disorderly, stop

1    being disruptive.  And I told them, I said, well, if you

2    knew what I felt, you'd be scared too.  Because if

3    somebody tried to rip your eyeballs out and beat you

4    with handcuffs, you'd be scared.  You wouldn't want to

5    come back there either.

6        So when I got over to the main unit, two more

7    officers joined in to escort me, Officer Young and

8    Officer Coats.  And as we was going, I seen one of the

9    defendants for another case.  I kind of said something

10   to him about what he did to me, that was Lieutenant

11   Cattnach [Ph].

12       But anyway, as we go on down and stuff, he kept

13   telling me stop being disorderly, stop being disruptive.

14   And when I got in the dorm, there was already Sergeant

15   Perkins, Officer Trumble, and Officer Gerencser standing

16   at the door, directly at the door that I was going to be

17   housed in.

18       And I told them that I wasn't going into the cell

19   with nobody because there's so much that happened.  I

20   can't explain, but they tried to get people to kill me

21   when I was here last time.  They give them knives to

22   come and try to kill me when he was in the cell with me.

23   That's why I be scared to be housed with somebody.

24       Well, anyway, when I got to the steps they told

25   me, you know, come on, you're going in the cell.  I said

1   no, I'm not going in the cell.  So I held the rail, and

2   I held the rail for about a second.  I was kind of like

3   leaning away from them, not into nobody.  I leaned away

4   from -- you can see it on camera.  And they snatched me

5   off the rail and battered [Ph] around me headfirst into

6   the wall.  I almost broke my neck.

7          My neck is still messed up from the injury.  I

8   can barely move my neck sometimes, but from there I was

9   almost unconscious.  Then they walked me about three

10  steps, then they slammed me on the floor face first, and

11  I was in handcuffs and shackles.  I couldn't do nothing

12  to stop the fall.  They was on my back, all that.

13         So while -- when I fell on the ground I still was

14  dazed, but I kind of was like still in it.  And Officer

15  Young slammed his knee on my neck from one way, and

16  Officer Hartley hit me with his walkie talkie two times

17  in the face and the head.  And they was pulling on my

18  leg, the leg irons and the shackles, and all that.  And

19  they had my face palmed [Ph] to the ground.

20         Some of the stuff I couldn't see really, but I

21  just knew who everybody was around, and I knew who was

22  on me, but it was Hartley, Young, and Gerencser and

23  Trumble.  I don't know, somebody -- but they had palmed

24  my face to the ground.

25         Somebody put their hand on my mouth trying to

1  suffocate me.  I thought it was Trumble, but it wasn't

2  Trumble.  It was either Young or Hartley that tried to

3  suffocate me, because I was yelling asking for help.  I

4  couldn't do nothing.  They told me to stop resisting

5  when I was already in restraints, I couldn't do shit.

6  Sorry for cussing, but I couldn't do nothing, ma'am.

7        So they were twisting my body around.  Like,

8  halfway and trying to bend my arm through the black box

9  and the handcuffs.  Like, I don't know.  It was so

10  painful, ma'am, they almost broke my wrist, ma'am.

11        Q.  Okay.

12        A.  I kept yelling for help.  I kept yelling for

13  help.  And telling them, please don't kill me.  Please

14  don't kill me.  They kept saying, stop resisting, stop

15  resisting.  I wasn't resisting.  I couldn't do nothing.

16  I was in handcuffs.  I was in shackles.

17        And somebody else was bending my leg.  My leg --

18  my leg, my right -- my left leg.  They was bending my

19  leg real bad.  And then once they got the shackles off,

20  they took the waist chain off.  But upon that time, they

21  kept bending me, bending my arm.  Bending my arm,

22  twisting, and twisting.

23        Then once they got the waist chain off, they took

24  the black box off.  Officer Young grabbed me by my neck

25  and my head, picked me up.  I don't know which

1    lieutenant or captain it was that told him, pick him up,

2    drag him in the room.  But it was White or Grimm, I know

3    it was.  At least I'm not stupid, but I know it was, I

4    just couldn't see it on the video, but I know it was.

5          But anyway, when they brought me in the room or

6    whatever, they ran out the room.  But before they ran

7    out the room -- I didn't put this in the complaint, but

8    Officer Young put his boot on my chin.  On my -- on my

9    fucking -- on my -- sorry.  Sorry for cussing.

10         He put his boot on my cheek, and he walked over

11   me and walked out the room, ma'am.  So I got up, and I

12   was asking for help and whatnot.  And everybody was

13   looking at me and just laughing at me.  Like, smiling;

14   Coats, White, Grimm.  They weren't doing it loud, but

15   they was doing it where I could see it.

16         So I was telling -- I said, man -- I'm human,

17   man.  I got nieces and nephews, man.  Why y'all do this?

18   You should never do me like that, man.  I even grabbed

19   the Bible.  I grabbed the Bible and asked God for help,

20   ma'am.  They laughed at me because I grabbed the Bible.

21   I don't understand that.  It's on camera.  I grabbed the

22   Bible and they asked -- they laughed at me because I

23   asked God to help me.

24         And they cut the camera off.  Coats said, yeah,

25   God, help us help him.  That's what Coats said.  And the

1   camera was off.  I'm trying to figure out who does that,

2   who laughs at God when you asking for help.

3        So I declared a mental health emergency.  And he

4   acted like -- he just ignored that.  He didn't care.

5   White just acted like, oh, well, it didn't matter.

6   Nothing, no kind of help, no kind of assistance.  And

7   him being the supervisor, you would have thought he

8   would protect me.

9        Nobody had it in their mind to protect me.  They

10  didn't want to do that.  They wanted to hurt me.  And I

11  think about it every day.  Every day, I can't sleep at

12  night because -- I don't know.  No, I can't.  I just

13  can't.  I can't sleep.

14        Q.  Okay.  So --

15        A.  Yes, ma'am.

16        Q.  I just want --

17        A.  Okay, I'm not done.  But my neck is still

18  messed up now.  I took -- I went to sick call, and I got

19  pain meds.  I got ibuprofen and that didn't work.  I

20  went and got the steroid shot for my neck.  It worked

21  for about three days.  I went and got more meds a couple

22  months later.  That ain't worked.  I'm taking Tylenol

23  right now for my neck, it still don't work.  My neck

24  hurts right now.

25        And mentally, I'm still scared for being here

1   because -- why am I here?  That's what I want to know on

2   the record.  Why am I here?  If I keep getting hurt at

3   this camp, why am I here?  Why?  Why?  So they can keep

4   doing it.  Nobody does nothing about it.  Why don't

5   nobody go to jail?  Why am I still here?  So they can do

6   it again.

7         Like I said on video, I might die this time while

8   I'm here.  And I really feel like that deep in my heart.

9   I pray every day that I make it away from here.  I want

10  this on the record, I pray that I make it away from

11  here.  And that's God's honest truth.

12        Q.  Okay.  Mr. Lee, I just want some more details

13  about the incident, all right?

14        A.  Okay.  It's on video.

15        Q.  I understand.

16        A.  Anything that I missed is on video.  I mean,

17  we got to go in front of a jury.  It's on video.

18        Q.  Okay, Mr. Lee --

19        A.  It's on video.

20        Q.  I understand.

21              (Simultaneous speakers.)

22  BY MS. VILLAPANDO:

23        Q.  So I still have some questions.

24        A.  Captain White cut the camera off.  Captain

25  White cut the camera off.  I was supposed to been in

1  that cell before that camera was cut off.  He did that

2  intentionally.  And you can hear me yelling for him --

3        Q.  Mr. Lee -- Mr. Lee, please.  I have

4  questions, all right?

5        A.  Yes.

6        Q.  All right.

7        A.  I'm listening.

8        Q.  All right.  Now, you said that you started

9  off at the annex, correct?

10       A.  Yes, ma'am.

11       Q.  So prior to the incident on May 17, 2024, had

12  you had any interactions with any of the defendants?

13       A.  Like, physically?

14       Q.  Any kind of interactions?

15       A.  Yes.  Once before, back in I'll say 2020,

16  Coats did a use of force on me, him and another officer

17  outside of the cell.  I didn't get hurt or nothing, but

18  you know, I was forced into the cell then by him and the

19  other officers.

20       Officer Young, he came to the door one day and

21  told me all kind of stuff about killing me.  This was in

22  2020.  And it's on record on the other case because I

23  sent it to the judge and made a complaint.  But the

24  judge told me that, okay, if you got a complaint, that's

25  a separate complaint.  It has nothing to do with this

1    complaint.

2          But he was saying that he would kill me because

3    when I filed a lawsuit on other officers that he's all

4    right with or whatever.  And I wrote an grievance with

5    them and it was approved or whatever.

6          Q.  Okay, Mr. Lee -- sorry.  I could not hear.

7          In 2020, for the use-of-force incident, who else

8    was involved?  Which one of the defendants?

9          A.  Coats.

10         Q.  Coats.

11         A.  Officer Coats.

12         Q.  And Young?

13         A.  And Captain Nicholas is noted.  Captain

14   Nicholas and Officer Coats did a use of force on me.

15         Q.  Okay.  And Young -- sorry.

16         A.  That was a physical.  That was a physical

17   incident.  But Young came to my door one day, and he

18   threatened me, telling me he would kill me because I

19   filed lawsuits on people that worked there at that time

20   or whatever.  And I wrote a grievance and it got

21   approved.

22         Other than that, no.  Nobody but White, I knew

23   him ever since he was a CO1.  I didn't know Grimm.

24   Perkins, I kind of knew her, but not really.  Gerencser,

25   he worked in C-dorm for a long time when I was in C-dorm

1    back in '20 and '21, but we never had no problems.

2         The only one I had problems with was Coats and

3    Young, that's in this case.

4         Q.  Did you ever file grievances against Coats?

5         A.  No.  No, ma'am.

6         Q.  And you said you filed the grievance against

7    Young?

8         A.  Yes, ma'am.

9         Q.  And when did you file the grievance?

10        A.  Like, 2020 or 2021.  It was in 2020.  Yeah,

11   2020.

12        Q.  Okay.  And your interaction with Young, that

13   occurred in the main unit or in the annex?

14        A.  The main unit.

15        Q.  Okay.  And since the incident of May 17,

16   2024, have you had any interactions with any of the

17   defendants?

18        A.  Young was harassing me for a while.  They had

19   to tell him to leave me alone.  He was coming to the

20   door and trying to bother me.

21        Q.  Did you file any grievances?

22        A.  No, but I wrote -- well, you kind of could

23   say.  But I mean, I'm going to be honest, because we on

24   the record.  I wrote requests and like, I think it might

25   have been a grievance, but I told him I'd kill him.  And

1    I told him, I'll kill him if he don't leave me alone.

2        Q.  Okay, now back to the incident.  So you were

3    escorted to the main unit.  When you entered the main

4    unit and the dormitory, which dormitory was this?

5        A.  E2102, E2.  E2.  They would house me in 2102.

6        Q.  Okay.  And when you arrived, were you ordered

7    -- did they give you an order to enter the cell?

8        A.  Yeah, they told me I was going in 2102.  The

9    inmate that was in there was already cuffed up.  And I

10   seen their interrogatories, someone said they -- they --

11   like they knew what was going on.  But they had the

12   inmate already cuffed, standing right in front of the

13   cell waiting for me to come in there.

14       Q.  Okay.  And when they ordered you to enter,

15   what did you do?

16       A.  I stopped at the rail and I held the rail for

17   not even two seconds.  Not even two seconds and they

18   like, they snatched me off the rail in maybe three or

19   four seconds.  But they snatched me off the rail and

20   rammed my head into the wall, headfirst.

21       Q.  Earlier you said you had leaned away.

22       A.  Yeah, I leaned away.  I didn't lean into

23   nobody.  I leaned away.  They was pulling me.  They was

24   pulling me.  And then they went on and smashed me and

25   rammed me into the wall.

1          Q.  The inmate that was already in the cell, was

2     it someone you knew?

3          A.  No.

4          Q.  Okay.  Did you tell the officers anything

5     when you refused to enter the cell?

6          A.  Did I tell him anything?  I told her I won't

7     go in a cell with nobody.  Believe me, before I got

8     there, I said, if I go there, I'm not going into a cell

9     with nobody.

10         Q.  Why didn't you want to be inside a cell with

11    someone?

12         A.  I told you before, when I was here, they was

13    giving my roommates knives and tried to kill me.  They

14    tried to giving them knifes to try to stab me, and

15    they'd be housed with me.  And I wish to refuse all

16    roommates.  Just like now, I haven't been taking no

17    roommates.

18         Q.  Okay.

19         A.  Now, they don't want to use -- can I say

20    something now?

21         Q.  Sure.

22         A.  They're not trying to force me in the room

23    with nobody.

24         Q.  Are you housed in close management?

25         A.  Yes, I'm in CM1 now, but I'm about to go back

1  to CM2.

2      Q.  Okay.  When were you placed on CM1?

3      A.  Yes.  November, around Thanksgiving.

4      Q.  What was the reason?

5      A.  Spoken threat, disobeying a verbal order.  I

6  think I got a battery on an inmate because they tried to

7  put a gay in my room that I had a problem with on the

8  compound.  They tried to house us together.  They tried

9  to force him in the room with me.  Regardless of what,

10  they promote violence here.  They don't care.  They want

11  us to kill each other.

12      Q.  Okay, let's see.  Now, do you remember which

13  officer gave you the order to enter the cell?

14      A.  I don't remember.  It might have been White.

15  Might have been White.  It might have been Grimm.  It

16  might have been Hartley.  It's one of the three.  I

17  don't remember, but --

18      Q.  So, yeah, I want just more clarification as

19  to your claims against defendant White.

20       Did he use any force on you?

21      A.  No.  No, ma'am.

22      Q.  And what about Grimm?  Did he --

23      A.  No, ma'am.  No, he did not use force on me.

24  I thought he did, but he didn't.

25      Q.  All right.  Now, I've heard you mention

```
 1   Perkins once.  Can you -- what are your claims against

 2   her?

 3        A.  She was taking off the handcuffs, the

 4   shackles and stuff.  But I mean, failed to intervene,

 5   really.  And, I mean, she was bending my arm at one time

 6   by my hand, so she was part of that with participating

 7   in trying to break my arm, my wrist, and my legs.

 8        I couldn't really see who was trying to break my

 9   leg, but she was down in there, so she was in on it.

10        Q.  Now, you said you were slammed to the ground.

11   Were you slammed to the ground in the cell or outside

12   the cell?

13        A.  Outside the cell.  But what happened is,

14   like, from my neck on back -- my neck up was inside the

15   cell.  Somebody moved me forward just a little bit.

16   That's how I got farther in the cell.  When I got

17   farther in the cell a little bit, that's when Hartley

18   kind of like hit me.  He hit me with the walkie talkie.

19   And he was leaning -- he was leaning on the toilet like

20   to balance himself.  And Young was leaning on the wall

21   to balance himself while he had his knee on my neck and

22   palmed my face to the ground.

23        Q.  So were Hartley and Young inside the cell?

24        A.  They was in the door frame.

25        Q.  But were they -- so when you get to the door
```

1    frame, did they enter the cell at all?

2           A.   They might -- they was in it, some.  Yeah,

3    some.

4           Q.   They did go inside?

5           A.   They was in the cell.  Some, yeah.

6           Q.   Okay.

7           A.   Part of their body was pushing through the

8    threshold of the door frame.

9           Q.   Okay.  You said something about -- did you go

10   unconscious at any point?

11          A.   No, ma'am.  But I was dazed real bad.

12          Q.   When you were on the ground, did the officers

13   give you any orders?

14          A.   Stop resisting.  Stop resisting.  I guess

15   that's the order, stop resisting.  And I wasn't

16   resisting.  That's something they're trained to do,

17   though, in situations like that.  They're trying to say

18   that stuff when we're not resisting.

19          Q.   Okay, you mentioned a previous lawsuit.  When

20   did he file that lawsuit?

21          A.   2020.

22          Q.   Do you recall the defendants in that lawsuit?

23          A.   Yes, ma'am.

24          Q.   Go on.

25          A.   Cattnach, he's a captain now.  McCraney,

1    she's somewhere else now, but her husband still works

2    here.  He's a major.  Richburg, but he died, of Santa

3    Rosa [Ph].  He no longer works here.  Officer

4    Boatwright.  He still works here.  He be back and forth

5    from here and the annex.  Jones, I don't think he work

6    here no more.

7        Who else?  I think that's it.  All I know is

8    there was seven.

9        Q.  Are any of the current defendants in this

10   lawsuit also defendants in the other lawsuit?

11       A.  No, ma'am.  But I would think, being that

12   Cattnach was a supervisor lieutenant at the time, I

13   would think for Perkins and Trumble and Gerencser to be

14   waiting on me at the cell, he had to be able to call

15   White on his service phone and -- to have it set up like

16   that.

17       Q.  Okay.

18       A.  And that was something I would have did, but

19   I didn't.  I was going to call their service phones --

20   the bills to see who was called that day, but I never

21   did it.  I would have did it, but I let it go.

22       Q.  Okay.  Now, you said there was an inmate

23   already in the cell.  Did he see the entire incident?

24       A.  He seen some of it.  But what happened, they

25   told him to turn around, so he won't see nothing, or

1    he'll get the same thing.  That's what he was told

2    before I even got there.

3            Q.  Okay.

4            A.  He looked a little bit, but they made him

5    turn around.  The man even cried from what he seen.  He

6    cried after that.  He cried with me.

7            Q.  What was his name?

8            A.  Eddie Cooks.  Eddie Cooks.  E-d-d-i-e,

9    C-o-o-k-s.

10           Q.  And apart from -- go on.

11           A.  And, ma'am, he doesn't want to get involved

12   because the man is scared, ma'am.  You hear me.  He told

13   me to tell you that if it ever came down to it, he

14   doesn't want to get involved because he's scared.

15           Q.  Is he still at Santa Rosa's main unit?

16           A.  I don't know.  I don't know.  We got

17   separated.

18           Q.  Okay.  Apart from Mr. Cooks, was there any

19   other witnesses?

20           A.  A lot of people.  But, I mean, the video is

21   all I need.  I don't need nothing else but the video.

22   Then you'll see everything, mostly.  I'm my own witness.

23   I like me for my part.

24           Q.  All right.  So now, let's discuss your

25   injuries.  What injuries did you suffer because of this

1    incident?

2        A.  Bad neck pain.  Like, my wrist had bruises on

3    it, like little scrapes.  Just kind of sore for a couple

4    days or whatever.  I didn't say nothing about my back,

5    but my back had already been messed up from the longest

6    since the last incident.  My back still hurts from even

7    before, but it hurts worse.

8        Mentally, I mean, they messed me up even worse.

9    They messed me up even worse.  I don't trust no

10   officers, ma'am.

11       Q.  Are these all the injuries?

12       A.  Ma'am?

13       Q.  Are these injuries you just listed all the

14   injuries?

15       A.  Yeah, I went -- I got an X-rayed for my neck,

16   but they said it looked all right.  But my neck is

17   messed up bad.

18       Q.  So after the use of force, were you seen by

19   medical?

20       A.  Yeah, they came to cell front.  Like, once or

21   twice, maybe three times.  And I told her I need help.

22   And she says, well, you gotta go to sick call or

23   whatever, there's something wrong.  She gave me a sick

24   call.

25       I went to sick call like three or four times,

1    back, to back, to back.  The first time, they gave me

2    ibuprofen.  The second time, I can't remember.  I think

3    I want to say I got the shot.  I got a shot in my butt

4    cheek.  Then I got air spray [Ph].  I took ibuprofen

5    like five or six times a day, and my neck didn't stop

6    hurting.

7         Like, right now.  I'm taking 3,000 every day and

8    my neck still hurts.

9         Q.  You said you were seeing "cell front."  What

10   does that mean?

11        A.  All right.  The nurse, they can't let you out

12   of cell.  They make an excuse saying that you're a

13   security risk.  So they had a nurse come to the cell

14   front to see you and ask you, are you all right?

15        And kind of like, at first my neck, it was

16   hurting a little bit, but it really didn't set in until

17   after I calmed down, I realized how bad my neck was

18   hurt.  And I let the nurse know like the second or third

19   time, that they messed my neck up.

20        Q.  Okay.  And did you receive any stitches for

21   any of the scrapes?

22        A.  No.  No stitches.  No.  No open wounds, like

23   deep lacerations or abrasions.  There wasn't none of

24   that.  I just had a couple of scrapes and bruises on my

25   arms.  I had a little -- I had a little knot, but it

1    wasn't really much.  That was on my head.

2         Q.  You said your -- you still had issues with

3    your neck?

4         A.  Yes, ma'am.

5         Q.  And that you got an X-ray.

6         A.  Yeah.

7         Q.  Can you clarify of what were the results of

8    the X-ray?

9         A.  They said it was normal.  They said it was

10   normal.

11        Q.  And when was the X-ray done?

12        A.  I want to say July.  July, the end of July,

13   maybe.  The beginning of August, I want to say.

14        Q.  Do you still get any -- receive any medical

15   treatment for your neck?

16        A.  Back in November was the last time I

17   complained about my neck, and they gave me -- I can't

18   remember the name of it.  But I got the records about to

19   come to me soon, because I just went off of medical

20   records two days ago for the meds that they gave me.

21         It was only for two days though, but I'm still

22   taking the Tylenols because I had two sheets of Tylenol

23   that I've been taking, and I take two or three a day.

24        Q.  All right.  You said you had some sort of

25   PTSD?

```
 1          A.   Yes, ma'am.

 2          Q.   And it was a result of this incident?

 3          A.   From the last incident and this one.

 4          Q.   Okay.

 5          A.   The last incident, I was held down and beat

 6   in the face and beat in the back with handcuffs.  And

 7   they almost ripped my eyeballs out my head, ma'am.

 8          Q.   And do you take any medication for that?

 9          A.   Yeah, I did the ibuprofens.  I took Mobic for

10   pain.

11          Q.   No, I meant for your PTSD.

12          A.   Okay.  And I took psych meds, but it was like

13   on down the line.  I took some psych meds because I was

14   going through a real bad anxiety and whatnot, fear, and

15   all kinds of stuff.  I couldn't sleep.

16           I didn't take it long because -- I don't know,

17   it's like the side effects would mess me up.  So I got

18   off of it, but I had just got off meds -- I had just got

19   off from meds, I want to say March, April.  April, I

20   think.

21          Q.   So you were not on your meds on May 17, 2024?

22          A.   No, ma'am.

23          Q.   You said that Young placed his knee on your

24   neck?

25          A.   Yes, ma'am.
```

```
 1              Q.   How do you know it was Young?

 2              A.   Because I know what side he was on.  I know

 3    what side he was on.  I know what side Grimm -- I mean,

 4    Hartley was on.  Young was on my right side, and Hartley

 5    was on my left side.

 6              Q.   When --

 7              A.   When they was twisting me, like sideways, I

 8    was able to look at everybody to see where everybody was

 9    at.

10              Q.   You said Hartley hit you with his walkie

11    talkie?

12              A.   Yeah.

13              Q.   How do you know he hit you with the item?

14              A.   I seen him do it, ma'am.

15              Q.   Did -- was there any injury as a result of

16    this?

17              A.   No, ma'am.  But he hit me pretty hard with

18    it, though.

19              Q.   Okay.  How long would you say this use of

20    force -- how long it lasted?

21              A.   That's something I gotta go over.  I want to

22    say, maybe three minutes.  I don't know.  I couldn't

23    really tell.  Everything happened so fast.

24              When you're the victim, you don't count the time.

25    You're just hoping --
```

```
 1          Q.  So you --
 2          A.  I was just hoping it would get over with.
 3          Q.  So you were on the ground --
 4          A.  Yeah, I was begging and pleading for my life
 5    that they won't kill me.
 6          Q.  And --
 7          A.  I wasn't worried about the time.  I just
 8    wanted it to be over.
 9          Q.  When did they stop using force on you?
10          A.  Once they got the shackles and the waist
11    chain off and the black box off.  And once they put me
12    -- they drug me in the cell and they ran out and closed
13    the door.
14          Q.  Did they say anything to you after you were
15    placed the cell?
16          A.  Give them the cuffs.
17          Q.  And did you comply?
18          A.  No.
19          Q.  And who -- who gave that order?
20          A.  Who -- yeah, Young.  Yeah, Perkins.  White,
21    even asked.  Then Coats asked.  The camera went off.
22    The officers that was in the dorm, they asked.  They
23    turned the camera back on.  Young -- I mean, White
24    asked.  I think Gerencser, whatever his name, I think he
25    asked.  I don't know.  Like, four or five of them asked,
```

```
 1   though.

 2        Q.  They asked you to give up the cuffs?

 3        A.  Yes, ma'am.

 4        Q.  Was this after the use of force or during the

 5   use of force?

 6        A.  After.

 7        Q.  After.

 8        A.  After they closed the door, they asked me for

 9   the cuffs.  I know Perkins and Young did for sure, right

10   after it happened.  I know White did.  He asked too.

11   For sure -- mandatory -- I know them three asked.

12        Q.  And I -- at this moment, I don't recall.  I

13   may have already asked, but after May 17, have you had

14   any interactions with the defendants?

15        A.  Like I said, no.  But, I mean, Young has

16   harassed me a couple times.

17        Q.  Yes, just Young.

18        A.  Like, every time he see me, he calls me baby

19   girl.  That's what he called me when he sees me every

20   time.  Just last week, hey, baby girl.  Yeah, that's

21   what he called me, baby girl.

22        Q.  Okay.  Just to summarize, right now, the only

23   ongoing injury is your neck?

24        A.  Yes, ma'am.

25        Q.  Anything else?
```

```
 1           A.   No --

 2           Q.   Sorry.

 3           A.   Anxiety, mentally.

 4           Q.   Anxiety, okay.  So neck pain and anxiety are

 5    your ongoing injuries?

 6           A.   Yep.

 7           Q.   Okay.  And you're not on any medication?

 8    Wait, sorry, let me -- let me rephrase that.

 9           And are you on any medication for any of these

10    issues?

11           A.   I just take, like I told you, I take Tylenols

12    that I got in my cell.  I got a sheet of Tylenols that I

13    take.

14           Q.   Okay.  Have you been involved in any uses of

15    forces since May 17, 2024?

16           A.   Physical use of forces?

17           Q.   Yeah.

18           A.   No.

19           Q.   How about chemical --

20           A.   Chemical agents?

21           Q.   Yeah.

22           A.   One time.  One time, February 28th.

23           Q.   And were any of the defendants involved?

24           A.   No.  Oh, well, I know -- but Perkins, she was

25    -- she's a lieutenant now, but she was standing off on
```

 1    the wall watching.  She didn't do nothing, though.  She

 2    didn't say nothing or do nothing, but she was standing

 3    and watching.

 4         Q.  Okay.  And no other physical altercation?

 5    Anything like that?

 6         A.  I had one with an inmate, but it wasn't

 7    nothing, really.  Like I said, they tried to put an

 8    inmate in my cell.  And we, like, almost attacked each

 9    other, but that don't count.

10         Q.  Okay.  So is there anything else you would

11    like to add regarding the incident that we have you

12    haven't addressed already?

13         A.  I think that's -- oh, and I had the mistaken

14    identity about who covered my mouth.  I said it was

15    Trumble, but it wasn't Trumble.  It was either Young or

16    Hartley who covered my mouth and nose when I was

17    yelling.  I'm gonna clarify that up for the court

18    reporter and the record.

19         Q.  Okay.  So how about we just go over -- just,

20    you know, for the record, go over the defendants and

21    what they did.

22         Okay, just so we're clear, let's start with

23    White.  What were White's actions?

24         A.  He failed to intervene, failed to stop them

25    from doing what they were doing.  He cut the camera off.

1    He ignored when he heard me cry.  He didn't, like,

2    didn't do nothing.

3          Q.  Okay.  What about Grimm?

4          A.  Same thing.  He didn't stop them from doing

5    what they were doing.  He had the power to do it.  They

6    were both the supervisors.  They could have told them to

7    stop.

8          Q.  What about Coats?

9          A.  I think he was pulling off the leg shackles,

10   I believe.  And he stood, at one time, he was like

11   standing, blocking the camera.  One of the cameras.  He

12   was standing behind Young at one time, I believe.

13         Q.  What about Perkins?

14         A.  She took off the leg shackles.  Yeah, she --

15   I want to say there was two different people had their

16   keys that took off my handcuffs.  And I mean, the leg

17   shackles and the waist chain.  It's like two different

18   people.  Everything happened so fast.  Everything

19   happened so fast.  But I kind of remember everything a

20   little.

21         Q.  And you said you reviewed the video correctly

22   when I sent it?

23         A.  Not all of it, because at first it was froze.

24   It was froze.  I couldn't really get it right.

25         Q.  Did you see, were you able to view anything

1  of the incident?

2        A.  When they turned the camera back on, yeah.

3  I seen a lot of it.

4        Q.  Okay.  And remember to speak clearly and

5  loudly so the court reporter can get your words, please.

6        A.  Yes, ma'am.

7        Q.  All right.  So we stopped with Perkins.  How

8  about Gerencser?

9        A.  Gerencser?

10       Q.  Yeah, what did he do?

11       A.  He was taking the shackles off, him and

12  Perkins took the shackles off.  And he, like, touched my

13  leg.  And --

14       Q.  So Perkins and Gerencser took your shackles

15  off, your leg shackles?

16       A.  Yes, ma'am.

17       Q.  Any injuries to your legs?

18       A.  I was just, like, real sore.  I had a little

19  cut on my ankle, but it didn't need medical treatment.

20  It was, like, it scratched the skin real bad.  My leg --

21  my ankle would hurt real bad, but I've had so many ankle

22  injuries like that, so it didn't bother me.

23       Q.  Okay.  All right, now let's move on to

24  Trumble.

25       A.  Trumble?

```
1          Q.  Yeah.

2          A.  Yeah, he ran me into the wall.  He ran me

3   into the wall and slammed me down.  I know I remember

4   that.

5          Q.  But you said you're no longer sure he's the

6   one that covered your mouth?

7          A.  It was -- like I said, it was not him.

8          Q.  Okay --

9          A.  I clarified that it was not.

10         Q.  I understand.  I just, you know, I'm just

11  making it clear for the record.

12         All right --

13         A.  Yes, ma'am.

14         Q.  Young, what did --

15         A.  He slammed me into the wall.  He slammed me

16  into the wall.  He slammed on my face.  He slammed his

17  knee in the back of my neck, palmed of my face to the

18  ground, beat me up by my head and my neck, and threw me

19  in the room.  That's what he did.  Then he stepped on my

20  -- he stepped on my face with his boot.

21         Q.  When you say stepped on your face, is this

22  after you were thrown into the cell or before?

23         A.  Inside -- inside the cell before they ran

24  out.  After they all drug me into the cell, he stepped

25  on my face as he was going out to cell now.
```

1          Q.  So your shackles were already off?

2          A.  Yes.

3          Q.  Okay.

4          A.  The black box was off.  And the waist chain.

5    The only thing I had on was the handcuffs.

6          Q.  Okay.  And now, Hartley, what did he do?

7          A.  Ran me into the wall.  He ran me into the

8    wall.  He slammed me outside the door on my face.  He

9    hit me with a walkie talkie.  He was trying to, like,

10   break my arms.  Young would try to break my arms, too.

11   Young was bending my arms back -- my wrist back against

12   the weight chain.  Both of them took turns at one time.

13         Q.  Okay.  Are you -- do you have any ongoing

14   injuries or issues with your wrist or arms?

15         A.  No, ma'am.

16         Q.  All right.  So, okay.  We got that settled.

17          Now, regarding your answers today, and I know you

18   mentioned the video, but is there any -- any other

19   evidence that has not been discussed that you have to

20   support your claims and answers?

21         A.  I don't think so.  I don't think so now.

22         Q.  Okay, that's fine.  Like I said, is there

23   anything else we have not addressed so far that you want

24   to talk about?

25         A.  I think that covers everything.

1          Q.  Okay.  Now -- okay.  Let's -- I want to

2     address something.

3          So at the end, you're gonna be asked whether you

4     want -- whether or not you want to read the transcript

5     or if you would like to waive your ability to read the

6     transcript.  Do you want --

7          A.  I can read them.  Last time -- last time,

8     they didn't give them to me.  I want them.

9          Q.  Okay.

10         A.  Do I gotta pay for them?

11         Q.  You have to pay for it now.

12         A.  All right.

13         Q.  You can -- so what's gonna happen is that

14    we're gonna send you a copy that you cannot keep and

15    with an errata sheet.  So if there are any minor

16    mistakes that you want to change, like if you said he

17    instead of she or something like that, you can change

18    that.

19         A.  Yes, ma'am.

20         Q.  Now, if you want an actual copy to keep,

21    we'll provide you the information for the court reporter

22    so you can purchase it from her.

23         A.  All right.

24         Q.  Yeah, but you do need to buy your own copy.

25         A.  I will.  I will, ma'am.

1          Q.  And if you have issues with that, just let us

2    know.  So we -- it's possible we can help you out with

3    that.

4          A.  Yes, ma'am.

5          Q.  I think I want to talk about -- as you

6    recall, our last conversation, I needed more time

7    regarding the answers to the interrogatories.

8          A.  Yes, ma'am.

9          Q.  I understand you have received some of them

10   and reviewed them?

11         A.  Yes, ma'am.

12         Q.  Okay.  So I got the answers and responses for

13   the other remaining defendants, the last three.  I have

14   gotten signatures for two.  We're having technical

15   issues with the last one.  It's possible that I send it

16   to you without a signature, but eventually you will

17   receive a signed copy.

18         Again, I just --

19         A.  Can I --

20         Q.  Go on.

21         A.  Can I ask you something?

22         Q.  Yeah.

23         A.  Okay.  I see where they objected, or you

24   objected to a lot of stuff.  If I don't challenge it,

25   what happens?

1        Q.  Well, they just go unchallenged.  Yeah, they

2  --

3        A.  Does it hurt me?

4        Q.  I don't really know how to answer that

5  question.  Yeah --

6        A.  All right.

7        Q.  Again, I want to explain why I objected to

8  them.  So as you read, I said it was because they were

9  argumentative.  It is --

10        A.  Can I say something?

11        Q.  Sure.

12        A.  Because last time I was direct like that, and

13  the attorney that was on the case, they answered.  See

14  what I'm saying?  I don't get why -- I don't get why

15  they couldn't answer those questions.

16        Q.  So the issue --

17        A.  We'll get to the bottom of it though.

18  Because, I mean it didn't -- we'll get to the bottom of

19  it.  Because I already see how it's going, and I'm not

20  scared to go to trial.  I'm not scared.  I want to go.

21  You hear me?  For real.  I want to go.

22        Q.  I understand.

23        A.  I'm not doing this for nothing.  You hear me?

24  I'm not doing this for nothing.  I want to go.  I want

25  to go.

1        Q.   Just calm down.   Remember the court reporter,

2    everything, she needs to be able to transcribe.

3        A.   Okay.   Yes, yes, yes, yes.   It gets intense.

4    That's all.   It gets intense because there no reason why

5    human beings should go through what I went through.

6        Q.   I understand.

7        A.   I want to tell my story, and I want people to

8    see what happens in here.   I really want them to see.

9    I want them to see why people not going to jail.   Ma'am,

10   I want them to see.

11       Q.   Let's go back to the interrogatories.  1,

12   like I said, I'm trying to get them to you as soon as

13   possible.  2, it should be mailed out today.   Hopefully

14   today, if I can meet the deadline for the mail.

15       So that will be -- yeah, I'm trying to get -- and

16   again like I said, you might get an unsigned copy but

17   I'm working on getting the signature.

18       A.   I got -- I got the invoice today too, ma'am.

19       Q.   Oh, and I'm about -- I'm going to talk to you

20   about that too.   So the responses, they're underway and

21   I thank you for your patience and you allowing me a

22   short extension for that.   So, thank you.

23       Now, for the request for production.   We have not

24   received back the stuff.   Have you -- I guess I should

25   ask, were you able to review them again?

1          A.  No, not yet.  I mean, I haven't looked over

2     it.  Like, I need another chance to look at them.

3          Q.  Yeah, so we have not received -- so instead

4     what we're going to do is just send it.  Just print them

5     out and make another copy and send them again.  And this

6     time, we're going to ask that you get a four-hour call

7     out.  And again, while the four-hour -- while we say

8     four hours, the institution may break that four hours

9     into several call outs.  Like, they might do two one day

10    and two on another day.  So, just be aware of that.

11         Even though we said four, it does not mean that

12    an actual four-hour schedule -- call out will be

13    scheduled.  It just means that you'll be given four

14    hours to view the items.

15         A.  Yes, ma'am.

16         Q.  And we're going to provide you another

17    document so you can list the items that you want to

18    purchase.  So we'll probably send that out tomorrow.

19         A.  I sent you another document request too,

20    ma'am.  Did you get it yet?

21         Q.  Yes -- no, I only have received that you

22    wanted to purchase the items.  But I have not -- I have

23    not received the other.

24         So something about that too, we've been having

25    issues with mail being routed to other divisions.  So

1  when you -- in the address -- and I'm going to start

2  adding this to my signature block, under my name put --

3  what is the -- let me check.  You should be putting

4  Civil Litigation Division --

5          A.  Okay.

6          Q.  Slash or dash North Florida Bureau.

7          A.  All right.

8          Q.  And again, I ask for your patience regarding

9  the documents, because as you know, we've been having

10 issues with getting those on time.  If for some reason I

11 do need an extension, I will try to get a call out with

12 you.  So I --

13         A.  Do you got my extension time?  I wrote for an

14 extension of time too, for 30 days.

15         Q.  For what exactly?  There's nothing that's

16 due.

17         A.  I mean, I got the invoice now and it's gonna

18 take me at least 25 days to get the money to you.

19         Q.  No --

20         A.  It's gotta come on my account --

21         Q.  No -- yes, I understand.  So the deadline for

22 the MSJ isn't until like May or June.  So you're still

23 good.  Should, you know, you need more time when the day

24 comes, you know, after discovery ends and you still need

25 an extension of time because you got some stuff late or

```
 1    very towards the end of the deadline, I'm not going to
 2    object to your extension.  I understand.
 3         A.  Yes, ma'am.  Thank you.
 4         Q.  The reason I say this is because it's
 5    possible the court will strike your extension because
 6    they'll be premature.  Just be aware of that, but they
 7    mostly prefer extensions after the deadline is coming
 8    up.  Like, so they might say it's a little early.  Just
 9    -- so if they strike it or something, just read what
10    they say and follow their instructions.
11         A.  All right.
12         Q.  All right.  So like I said --
13         A.  I mean, I know you're saying that, but you
14    know, I had to wait all that time until today just to
15    get the invoice.  I mean, I've been ready, you feel me?
16    I've been having to wait on you though, ma'am.  You see
17    what I'm saying?  Now it's getting to where my back is
18    against the wall.  You see what I'm saying?  Because I
19    got to do stuff to get back to you.  You feel me?
20    That's all I'm saying.
21         Q.  Here's the thing, so --
22         A.  So I've been on beat.  You haven't been on
23    beat.
24         Q.  I understand.  But remember, Mr. Lee, this is
25    -- you have all -- you have time.  This is your only
```

1    case, where I have a case flow of over 20 cases that I'm

2    handling right now.  So I --

3            A.  And that's what I understand, ma'am.  You

4    hear me.  That's what I understand.  And I'm very

5    understanding, ma'am.

6            Q.  And this is -- you know, justice is slow.

7    The courts have also have their own caseload and they

8    also take a while.

9            And so -- but like I said, if you -- if after,

10    you know, discovery ends and the deadlines for the

11    motion judgment come up, I'm not going to oppose your

12    extensions.  Because I understand that, you know, there

13    have been some delays.  And so, you won't see any

14    division from me.

15            You can even say it's unopposed that you --

16    because we have discussed this.  And so -- and this is

17    good.  However, I will say, this goes for your first

18    extension of time in the future, just because some other

19    things can come up and it -- you know, it might not be

20    our fault and -- but for the most part I don't -- I get

21    the issue with the documents.  And it's unlikely that I

22    will oppose.

23            I won't oppose based on, you know, you not

24    getting documents on time.  And the court will likely

25    grant it because again, it understands the issue with

1    incarcerated individuals obtaining documents and such.

2    So I will -

3           A.  The mail is an answer too.

4           Q.  Yeah.

5           A.  Yeah.

6           Q.  So, yeah.  All right.  Like I said, I'll be

7    on the lookout for your other requests for production.

8    And so, I can respond that to that as quickly as

9    possible too.  And --

10          A.  What it is, the grievance files and like any

11   complaints they didn't have on them about abusing

12   inmates, mistreatment of inmates, because I know they

13   said they haven't did that.  But I know White been sued

14   a couple times.  Gerencser been sued a couple times.

15   Young been sued.  Perkins has at least 10 cases on her

16   right now.  So if they told you that, they lying.  You

17   see what I'm saying?

18          Q.  Well, so you need to be very clear in your

19   questions, Mr. Lee.  When you said you -- you asked

20   whether they had been written up, as opposed to whether

21   civil complaints have been filed against them.  Just --

22          A.  I know, but can I say this?  Can I say this?

23   In order for them to be sued, the person who's suing

24   them has to write a grievance.  See what I'm saying?

25   The PLRA, you gotta write a grievance if you're a

1    prisoner.  So, come on.  It's in their file.  That's all

2    I'm saying, ABC.

3          Q.  But you need to be very clear about that,

4    Mr. Lee.  If you're asking about if grievances have been

5    filed against a defendant, you need to -- you need to --

6    "written up" is very broad and very vague.

7          A.  Okay.  Well, what I'm saying is grievances,

8    basically --

9          Q.  Okay.  So we -- if it's possible, then I will

10   file -- I will submit some amended responses.  If by --

11   if you're saying that that question was in regards to

12   grievances, because we construed it as whether they had

13   ever gotten written up by HR.  That's how we interpreted

14   the question.

15         A.  Yes, ma'am.

16         Q.  But as you have indicated otherwise, I will

17   see what I can do about that, okay?

18         A.  Yes, ma'am.

19         Q.  All right.  So I will address that.  Will we

20   send the first request for production and give you time

21   to review.  And I'll be on the lookout for the second

22   one.

23          Is there anything else that you'd like to

24   discuss?

25         A.  I think that's it, ma'am.

1          Q.  Okay.

2              MS. VILLAPANDO:  Court Reporter, you can

3    end.  We can go off the record.

4              THE COURT REPORTER:  Okay, we'll go off the

5    record.

6    (Whereupon, the examination was concluded at 3:12 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA)

3    COUNTY OF LEON)

4

5         I, Samantha Adams, court reporter, certify that I

6    was authorized to and did stenographically report the

7    deposition of ROBERT SINCLAIR LEE, Pages 1 through 50;

8    that a review of the transcript WAS REQUESTED; and that

9    the transcript is a true and complete record of my

10   stenographic notes.

11

12        I further certify that I am not a relative,

13   employee, attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorney or counsel connected with the action, nor am I

16   financially interested in the action.

17

18             DATED this 5th day of MAY, 2025

19             _____
                        *Samantha Adams*

20             SAMANTHA ADAMS, Court Reporter

21

22

23

24

25

1    TO:   JUANITA VILLALPANDO
            The Capitol, Suite Pl-01
2           Tallahassee, Florida 32399
            Email: juanita.villalpando@my floridalegal.com
3
     IN RE:  Robert Sinclair Lee vs Captain J. White, et al.
4    CASE NO:  3:24-CV-321-TKW-HTC

5    DATE TAKEN:  April 16, 2025
     DEPONENT:  ROBERT SINCLAIR LEE
6
            Please take notice that on the 16th day of April,
7    2025, you gave a deposition in the above cause.  At that
     time, you did not waive your signature.
8
            Please make arrangements with For The Record at
9    850-222-5491 to exercise your right to read and sign the
     transcript.  If you do not read and sign the deposition
10   within 30 days or at such other time as instructed by
     counsel, the original, which has already been forwarded
11   to the ordering attorney, may be filed with the Clerk of
     the Court and your reading and signing may be considered
12   waived.

13          If you wish to waive your signature now, please
     sign your name in the blank at the bottom of this letter
14   and return it to the address listed below.

15   Very truly yours,

16   _____

17   SAMANTHA ADAMS Court Reporter

18   For The Record

19

20   I do hereby waive my signature
     _____
21

22

23

24

25

```
 1                          ERRATA SHEET
              DO NOT WRITE ON TRANSCRIPT ~ ENTER CHANGES
 2
     IN RE:  Robert Sinclair Lee vs Captain J. White, et al.
 3   CASE NO: 3:24-CV-321-TKW-HTC

 4   DATE TAKEN:  April 16, 2025
     DEPONENT:  ROBERT SINCLAIR LEE
 5
     PAGE_____LINE_____SHOULD BE_____
 6
     PAGE_____LINE_____SHOULD BE_____
 7
     PAGE_____LINE_____SHOULD BE_____
 8
     PAGE_____LINE_____SHOULD BE_____
 9
     PAGE_____LINE_____SHOULD BE_____
10
     PAGE_____LINE_____SHOULD BE_____
11
     PAGE_____LINE_____SHOULD BE_____
12
     PAGE_____LINE_____SHOULD BE_____
13
     PAGE_____LINE_____SHOULD BE_____
14
     PAGE_____LINE_____SHOULD BE_____
15
     PAGE_____LINE_____SHOULD BE_____
16
     PAGE_____LINE_____SHOULD BE_____
17
     PAGE_____LINE_____SHOULD BE_____
18
     PAGE_____LINE_____SHOULD BE_____
19
     PAGE_____LINE_____SHOULD BE_____
20
     PAGE_____LINE_____SHOULD BE_____
21
     PAGE_____LINE_____SHOULD BE_____
22
     UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ
23   THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT
     ARE TRUE.
24
     _____
25   DATE                              ROBERT SINCLAIR LEE
```