**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

ROBERT SINCLAIR LEE,

      Plaintiff,

vs.                                                    Case No. 3:24-cv-321-TKW-HTC

GRIMM, et al.,

      Defendants.

**PLAINTIFF'S RESPONSE TO**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiff, ROBERT LEE, through counsel, responds to Defendants'

Motion for Summary Judgment (Doc. 78), and would show as follows:

**STATEMENT OF DISPUTED AND ADDITIONAL FACTS**

On May 17, 2024, Robert Lee was a Florida state prison inmate at

Santa Rosa Correctional Institution Annex. (Doc. 84-6, Declaration of Robert

Lee ("Lee Decl.") at ¶ 1).[1]

Between 11:00 and 1:00, Officer Gabriel Hartley told Mr. Lee he was

getting transferred to the Main Unit. (Doc. 78-9, Lee Depo. At 9:10-15) (Doc.

84-6, Lee Decl. at ¶ 2). Lee said he couldn't go there because he previously

sued staff who still worked there and he was in fear for his life. (Doc. 78-9,

---

[1] Repeated efforts to get the signed affidavit from Plaintiff through Florida Department of Corrections ("FDC") Legal Mail have repeatedly failed. Counsel will substitute the verified copy of the affidavit when received.

Lee Depo. 9:15-17, 10:3-4). Mr. Lee told Hartley he feared officers currently working at the Main Unit due to a lawsuit Lee had previously filed against them in which he had received a modest recovery. (Lee Decl. at ¶ 3)

This lawsuit, filed in the United States District Court in the Northern District of Florida, Pensacola Division, is *Robert Sinclair Lee v. Lieutenant T. McCranie, et al.*, 3:20-cv-05462-MCR-HTC. (*Id*. at ¶ 4). (*See* Doc. 84-5, First Amended Complaint, 3:20-cv-05462-MCR-HTC).

Mr. Lee asked Hartley to call the captain and mental health staff to let them know he was in fear for his life. (Doc. 78-9, Lee Depo. 9:19-21).

Captain Jack White arrived with a mental health employee, to whom Mr. Lee explained his fear. (*Id*. at 9:21-24).

Captain White told Mr. Lee he was going to the Main Unit by force or that Lee could make the right choice and go freely. (Lee Decl. at ¶ 6).

Mr. Lee explained to Mental Health Counselor Angel Garcia what happened four years ago at Santa Rosa Main Unit and that he was now suffering extreme anxiety after being held down and brutally beaten by five guards at the Main Unit. (Lee Decl. at ¶ 7). Mr. Lee told Garcia that if he returns to the Main Unit officers will hurt him again as they had threatened. (Lee Decl. at ¶ 10), Garcia said she could do nothing but document what he said. (Lee Depo. 9:25-10:3). Mr. Lee explained to Garcia he was suffering

2

from and had been prescribed medication for anxiety disorder. (Lee Decl. at ¶ 8).

Mr. Lee said he wanted officers to get the (handheld) camera, so he could talk on camera about what happened previously. (Doc. 78-9, Lee Depo. 10:12-14). He told Lt. Jacob Grimm he would comply with the escort once he said what he had to say. (*Id*. at 10:12-14).

Capt. White, Officer Hartley and Lt. Grimm came to administer chemical agents with a hand-held use of force camera. (Lee Decl. at ¶ 11).

At approximately 1:02 pm, in K Dorm, Officer Steven Vega, using the handheld camera, began recording Lt. Grimm, who instructed Vega:

> I am instructing you to position yourself in a manner that allows you to capture <u>all events that occurred during this incident</u> and to reposition yourself if necessary to capture these events and to continue recording until I instruct you otherwise.

Doc. 78-2 (sealed), Def. Exhibit A - Escort Handheld Video ("Escort Video") (emphasis added).[2] (Doc. 7, Escort Video Transcript at 1).

Grimm stated on camera, "I will now attempt to resolve the disturbance by counseling with inmate Lee," and to only use chemical agents if necessary, "after all reasonable, non-force intervention efforts have failed." (Escort Video at 1:55; Transcript at 1-2).

---

[2] An unofficial transcript of Mr. Lee's and the officers' dialogue on video during the escort is provided as Doc. 84-7.

Grimm then ordered Lee to "get out the door" (Escort Video at 2:28; Transcript at 2), and warned Lee to submit to an unclothed search and wrist restraints, and exit his cell for cell reassignment. (Escort Video at 2:34; Transcript at 2). Grimm advised that if Lee continued to refuse, chemical agents would be administered, (Escort Video at 2:42; Transcript at 2).

Lee agreed to comply, stating:

I am willing to comply with that order. And I would ask the camera to escort me all the way to the main unit on camera. I comply with that order, sir. I comply with that order on camera. You will take me to main unit with the camera on me. I comply with that order sir. That way maybe I can address my issue on camera, you know. […] Maybe I can get my point across by the time I get over there to Echo Dorm.

(Escort Video at 3:47; Transcript at 2). Lee added, "I need the camera on me the whole way while I get escorted." (Escort Video at 4:40; Transcript at 2).

Mr. Lee stated that officers at the (Main Unit) had previously tried to kill him, that he wanted to talk to the camera "'Cause it could get uglier; it did before." (Escort Video at 6:41; Transcript at 2).

Mr. Lee stated that when officers there tried to kill him they "tried to rip my eyeballs out of my head, and beat me with handcuffs," that he got beat by handcuffs "real bad," they kicked him in the face, and he suffered a concussion. (Escort Video at 6:44; Transcript at 2).

Mr. Lee complied with Hartley's search commands. (Escort Video at

7:44; Transcript at 3). Lee complied with Hartley's order to kneel, whereupon Hartley and another officer placed leg shackles, handcuffs, a black box and waist chains on Mr. Lee. (Escort Video at 9:44). Grimm then announced they were heading to Echo Dorm. (Escort Video at 11:01; Transcript at 3). Lee was then escorted outside. (Escort Video at approx. 11:42-22:48).

*Escort*

During the escort, Mr. Lee asked how he was supposed to feel safe when officers beat him up badly where he is going. (Escort Video at 14:20; Transcript at 3). Lee repeated that officers tried to kill him the first time (he was at the Main Unit). (Escort Video at 18:38; Transcript at 4). Officers Young and Coats joined in the escort. (Lee Depo. 11:6-8).

En route, Mr. Lee came across Lt. Cattnach, and protested the abuse Cattnach had committed against him, including beating him with handcuffs. He mentioned Cattnach was a defendant in the prior lawsuit Lee had settled. (Escort video 18:02; Transcript at 4) (Lee Depo. 24:22-25).

As they approached Dorm E, Mr. Lee became more upset. Hartley told him to "hush." (Escort Video at 21:16; Transcript at 4). Lee said "Ain't no hush! Scared for my motherfuckin' life! Y'all got me fucked up man! Cause I'm filing a grievance about it […]" (Escort Video at 21:17; Transcript at 4).

As they neared the dorm, Mr. Lee stated:

> This has got me back here. Motherfuckers tried to kill me! Fuck if I ain't gotta hush my mouth. Gotta hush my mouth, man! I'm telling the truth! You think I gotta hush boy, when I'm telling the truth?! You bitches tried to kill me! I ain't lying to nobody!

(Escort Video at 22:20; Transcript at 5). Inside the building, Lee stated:

> I'm not going in a cell with nobody! I'm not going in a cell with nobody! I need you all to know that. I'm not going in a cell with nobody! I'm not going in a cell with nobody! I sure ain't! I sure ain't going in a cell with none of you bitches.

(Escort Video at 22:47; Transcript at 5). After entering the dorm dayroom,

Mr. Lee stated "I'm not going in there." (Escort Video at 23:10). Throughout

the escort, the camera operator had remained behind Mr. Lee. But as Lee

was escorted through a chain link barrier into the housing area, Capt. White

indicated for the camera to turn toward him. (Escort Video at 23:26). The

camera swiveled away from Mr. Lee to face Capt. White, who announced:

> Camera operator, inmate Lee complied with all of our orders issued. No force was utilized during this incident. Camera operator, state your name, date, and time as [unintelligible] on the handheld video camera.

(Escort Video at 23:10; Transcript at 5). Mr. Lee at this point was off camera.

White gave the date and time, which was not displayed on the video, as May

17th, 2024, 1:26. Mr. Lee is heard screaming off camera. (Escort Video at

23:31). But White reached toward the camera to turn it off, and the recording

ended. (Escort Video at 23:34; Transcript at 5).

*Entering Echo Dorm: Fixed Wing Video*

Lee was escorted into Echo Dorm where a group of officers was already waiting in front of the cell. (See Lee Decl. at ¶ 17). At this point, with the hand-held camera off, the only video witnessing the action was a surveillance camera at the other end of the Dorm. (*See* Doc. 78.4 (sealed), Defendants' Exhibit C - W2 Control Fixed Wing Video). The video is low resolution and it is possible to make out human shapes but not identify any individual or to pick anyone out from a group of people standing close together. *See Id*.

Officers are standing at a cell front across from a metal stair going up to the second tier. *Id*. Others, including Lee, are entering through the doorway and walking toward the cell. *Id*. At some point the surveillance video shows a blurred mass of people move toward and then away from the staircase, and then quickly across the floor, stopping suddenly at the wall. *Id*. It is no longer possible to tell with any clarity what is happening except through the conflicting narratives of witnesses, including Mr. Lee. *Id*.

Mr. Lee says, for example, that he was violently slammed head-first into the wall and then to the floor face-down, Young deliberately slammed his knee onto Lee's neck, and Hartley hit him in the head twice with a walkie-talkie, causing tremendous pain. (Lee Decl. at ¶¶ 19-24).

7

*Second Handheld Video: Use of Force*

Approximately one minute after being switched off, the handheld camera restarted, with Capt. White inside the housing area near Lee's cell. (Doc. 78-6 (sealed), Def. Ex. E, Use of Force Video ("UOF Video")). Nearby the doorway to cell 2102, a mass of officers can be seen on the ground. Mr. Lee is not clearly visible under the dogpile. ("UOF Video"). White gives the date and time on camera: 1:27 pm. ("UOF Video"). The camera then turns to show officers on and around Mr. Lee, on the ground. ("UOF Video"). Off camera, White says that "at approximately 1:26 pm reactionary physical force was utilized [unintelligible] inmate Lee [unintelligible] unlawful commands [unintelligible] refusal to enter the cell." ("UOF Video"). White states that force was used by Young, Perkins, Gerencser, and Hartley. ("UOF Video").

It was during the approximately one-minute gap in filming, that officers began to use excessive force on Mr. Lee.

*The Excessive Force*

When Mr. Lee arrived in the dorm, Lee saw Sgt. Perkins and Officers Trumble and Gerencser at the cell door where he was to be housed. (Lee Depo. 11:14-17). Lee notes that there are usually two officers on escort like his but now the group has grown to nine officers. (Lee Decl. at ¶ 17). Lee

told them that he wasn't going in the cell with anybody, because there's so much that had happened. (Lee Depo. 11:18-19). Defendants, in their Motion for Summary Judgment, acknowledge they were aware before entering Echo Dorm (and before the hand-held camera was turned off) that Lee would resist being placed in a cell with another inmate.[3]

Mr. Lee was scared to be housed with another inmate because officers had tried to get inmates to kill him when he was there the last time, by giving other inmates knives. (Lee Depo. 11:20-23).

Mr. Lee could see that the cell he was being placed into contained another inmate. (Lee Depo. 25:22-24)

When Mr. Lee got to the stairs near the cell and was told to enter the cell, he held the nearby rail for about a second, leaning away from the officers. (Lee Depo. 11:24-12:4). Hartley, Young, Trumble and Gerencser snatched him off the rail and slammed him headfirst into the wall with force that felt like it could have broken his neck. (Lee Depo. 12:4-6).[4] Lee felt extreme pain in his head and neck, and woozy. (Lee Decl. at ¶ 19). Lee was almost unconscious (Lee Depo. 12:8-9) and "dazed real bad." (Lee Depo.

---

[3] Lee explained that officers at the Main Unit had given a previous cell mate a knife and asked him to stab Lee. Instead, the cell mate showed him the knife and told him about the officers' order. Officers at the Main Unit have called Lee a "snitch" in front of gang members which is an invitation to them to do him harm. (Lee Decl. at ¶ 45).

[4] Hartley wrote that he, Young and Trumble "utilized a forward pushing force" to place Inmate Lee against the wall to maintain control of him. (Doc. 84-2, Incident Report at 1).

24:11). Hartley, Young, Trumble and Gerencser then walked him over a few steps and slammed him on the floor face-first, again causing tremendous pain. (Lee Depo. 12:9-10) (Lee Decl. at ¶ 20). He was in handcuffs and shackles and could do nothing to stop the fall. (Lee Depo. 12:11-12).

Incident Reports by Hartley, Young, Trumble and Grimm claim that Mr. Lee "began to drop his personal body weight" and that they "placed Inmate Lee into the prone position." (Doc. 84-2, Incident Reports, at 3, 5, 15, 19). Hartley, Young, Gerencser and Trumble got on Mr. Lee's back. (Lee Depo. 12:11-12; 12:21-23). Young did a knee strike to Lee's neck. (*Id.* at 12:14-15). The knee strike caused tremendous pain. (Lee Decl. at ¶ 21). Mr. Lee thought he was going to die. (Lee Decl. at ¶ 21).

Hartley hit Lee with his walkie talkie twice in the face and head. (Lee Depo. 12:16-17, 39:8-9). (Lee Decl. at ¶ 24). Young or Hartley covered his mouth cutting off his air because he yelled. (Lee Depo. 12:25-13:3). Officers including Perkins and Coates twisted and pulled his shackles, as if trying to break Lee's ankles. (Lee Depo. 12:17-18). (Lee Decl. at ¶ 26).

The officers pushed Mr. Lee further into the cell, completely restrained, Young was leaning on the wall to balance himself while he had his knee on Mr. Lee's neck and palmed his face to the ground. (Lee Depo. 23:20-22).

Officer Young palmed Lee's face to the concrete with all his weight

which was extremely painful. (Lee Decl. at ¶ 22). (Lee Depo. 12:18-19). Grimm, Perkins, Coates, Trumble, Young, Gerencser and Hartley were all yelling "stop resisting," but he  was not resisting. (Lee Decl. at ¶ 23). In Mr. Lee's experience, Officers appear to be trained to say stop resisting even when inmates are not resisting. (Lee Depo. 24:16-18).

White, Grimm, Perkins, Coates, Trumble, Young and Gerencser did not intervene when Hartley hit him with the walkie-talkie, although they could have and had time by the second blow. (Lee Decl. at ¶ 25). Trumble, Young, Hartley, White, Grimm and Gerencser could have stopped Perkins and Coates from trying to break Lee's ankles but did not. (Lee Decl. at ¶ 27).

Young, Hartley, Trumble, and Gerencser violently snatched on the waist chain and bent Lee's wrist backwards, as if attempting to break his wrist. (Lee Decl. at ¶ 28). Young, Hartley, and Gerencser took turns twisting Mr. Lee's wrist. Hartley tried to break his wrist. Trumble helped them, pulling on his arm. (Lee Decl. at ¶ 28). Officers kept telling Mr. Lee to stop resisting when he was restrained in handcuffs, with black box and waist chain, and shackles and could hardly move. (Lee Depo. 12:18-19, 13:14-16).

They kept bending his arm, "twisting, and twisting." (Lee Depo. 13:20-22). Grimm said to pick up Mr. Lee and drag him into the cell. (Lee Depo. 13:25-14:3). Young and Hartley picked Lee up by his neck and head. (Lee

Depo. 13:24-13). Gerencser, Young, Trumble and Perkins dropped him on his stomach. (Lee Decl. at ¶ 30). Officer Young put his boot on Mr. Lee's chin and cheek, walked over Lee as he left the room. (Lee Depo. 14:8-11). All quickly exited the room, leaving Lee on the floor in pain. (Lee Decl. at ¶ 30). Grimm and White were supervisors who had the power to stop the excessive force but did not intervene. (Lee Depo. 35:23-36:7).

Sgt. Perkins participated in bending Mr. Lee's limbs as if trying to break his arm, wrist, and legs. (Lee Depo. 22:25-23:7). Hartley and Young bent, as if trying to break, Mr. Lee's arms. (Lee Depo. 39:9-10). Young similarly bent Lee's wrist back against the waist chain. (Lee Depo. 39:10-12).

*Staff Violations*

Capt. White was supposed to continue video recording until Mr. Lee was in the new cell. (Lee Depo. 16:24-17:2). White intentionally turned off the camera prematurely. (Lee Depo. 17:1-2). FDC's Use of Force Video Recording Protocol mandates:

> Video recordings of all use of force incidents shall continue uninterrupted from commencement of recording until the situation is stable and under control and the inmate is placed in a secure cell or transport vehicle for transfer.

F.A.C. 33-602.210(4)(c)1.a. (eff. 3/1/2022). A memo to the Office of the Inspector General from the Santa Rosa C.I. Office of the Warden, by Major LaToya Brown, May 30, 2024, noted discrepancies from reviewing the use

of force videos. Brown also noted that, in violation of procedure 208.039, Capt. White failed to note the "numerous allegations of staff misconduct" Mr. Lee made during the escort, and that White should have noted the allegations on the use of force report and submitted a separate report for MINS processing. (Doc. 78-21, Brown Memos at 1). Major Brown concluded:

> Corrective Action: Captain White will receiving [sic] remedial training and use of force as well as report writing criteria. A separate incident report was submitted for discipline due to the severity of the violations. Captain White was also spoken with about the importance of ensuring all events are captured in their entirety and the appearance of impropriety in the way the events unfolded.

(*Id*. at 1, emphasis added).[5] (See also 78-21, MINS Report, 78-21 at 3-4).

During his escort, Lee alleged that officers at the Main Unit "tried to kill me."(*Id*.) (Doc. 78-21 at 2) He alleged Lt. Cody Cattnach beat him with handcuffs the last time he was at the Main Unit. (*Id*.) Mr. Lee continued to yell I'm not going in the cell." (*Id*.) Mr. Lee continue to yell that he was in fear for his life and stated "Officer Young, you're one of the main ones that be doing it." (*Id*.) Mr. Lee continue to yell and curse at staff. (*Id*.) At 1:24 p.m. Mr. Lee along with escorting staff entered E dorm and again stated "I'm not going in the cell with nobody." (*Id*.) At approximately 1:26 p.m. Captain White

---

[5] Major Brown wrote a separate memorandum to OIG, that during the post use of force video, "Vega who was not trained properly on handheld camera usage lost visual of the inmate Lee while inside the cell." (Brown Memos at 2).

closed the camera while Lieutenant Grimm was present. (*Id.*) Mr. Lee could be heard protesting before the closing statement was completed. (*Id.*)

### Harassment

In December 2021, as he left Santa Rosa C.I., five officers (not defendants here) told Mr. Lee he should never return to Santa Rosa, because if he did, they would "have something" for him, indicating they would punish him for his (prior) lawsuit. (Lee Decl. ¶ 43).

Around November 2020, Officer Young told Mr. Lee he would kill him if he saw him on the street, that he doesn't like inmates who file lawsuits. (Lee Decl. ¶ 44). Young was not a defendant in the other lawsuit, but worked in the rec yard with Officer Boatwright, who was a defendant. (*Id.*)

Young, Coates and Gerencser at Main Unit called Mr. Lee a snitch in front of gang members to incite them to attack him. (Lee Decl. ¶ 45). A cell mate said an officer at the Main Unit gave him a knife to stab Lee. (*Id.* ¶ 42).

After the incident (continuing his harassment of Lee) every time he saw Mr. Lee, Young would call him "baby girl." (Lee Depo. 33:13-21).

### Grievance and Disciplinary Report

In late May 2024, Mr. Lee filed an informal grievance, which was approved: Inspector's office number 119-2405-1441. (Lee Decl. at ¶ 7).

A disciplinary report for disobeying a verbal order was initially issued

14

against Mr. Lee but then never processed. (Id. at ¶ 8). There was never any disciplinary hearing regarding this matter and Mr. Lee was never found guilty of any wrongdoing. (*Id*.).

## MEMORANDUM OF LAW

The standard is well-settled that summary judgment is authorized only when the moving party establishes that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed. R. Civ. P. 56(c); *Adickes v. S. H. Kress & Co*., 398 U.S. 144, 157 (1970). When evaluating a summary judgment motion, the Court must view the evidence and all factual inferences in the light most favorable to the non-moving party. *See Adickes*, 398 U.S. at 157.

The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party must initially "present[] evidence which, if uncontradicted, would entitle it to a directed verdict at trial." *Walker v. Darby*, 911 F.2d 1573, 1576 (11th Cir. 1990). "Federal Rule of Civil Procedure 56(e) shifts to the non-moving party the burden of presenting specific facts showing such contradiction is possible." *Id.*

An issue is genuine if "a reasonable trier of fact could return judgment for the nonmoving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A self-serving, uncorroborated affidavit can create a genuine dispute of material fact. *United States v. Stein*, 881 F.3d 853, 858 (11th Cir. 2018); but "[c]onclusory allegations and speculation are insufficient to create a genuine issue of material fact." *Glasscox v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018). "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990).

## I.    A jury could reasonably infer Defendants violated Lee's rights.

Defendants are not entitled to summary judgment because disputed material facts exist as to whether the Defendants utilized excessive force or failed to intervene. The video evidence, heavily relied on by Defendants, was interrupted at a critical point of the action just prior to Plaintiff being propelled head-first into a wall during which time the escorting Captain had intentionally

discontinued the video recording of the escort.[6]

## A. Defendants are not entitled to summary judgment because there are disputed facts as to whether they utilized excessive force.

The Eighth Amendment can give rise to claims challenging the excessive use of force against prisoners. *Thomas v. Bryant*, 614 F.3d 1288, 1305 (11th Cir. 2010) (reviewing Eighth Amendment claims). An excessive-force claim requires a two-prong showing: (1) an objective showing of deprivation or injury that is "sufficiently serious" to constitute a denial of the "minimal civilized measure of life's necessities"; and (2) a subjective showing that the official had a "sufficiently culpable state of mind." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994) (other citations omitted)). It is the "unnecessary and wanton infliction of pain" caused by force used "maliciously and sadistically" for the very purpose of causing harm that constitutes cruel and unusual punishment. *Whitley v. Albers*, 475 U.S. 312, 322, 106 S. Ct. 1078, 89 L.Ed.2d 251 (1986). Where an Eighth Amendment claim is based on allegations of excessive force, the question turns on whether the prison guard's "force was applied in a good

---

[6] Captain Jack White and his video operator Steven Vega received disciplinary consequences for failing to continue the video recording where it was anticipated that there would be resistance to placing Mr. Lee in the cell with another inmate and, along with other persons present during the escort, for failing to report Mr. Lee's allegations as to a history of abuse at the Santa Rosa Correctional Institution Main Unit. (Doc. 78-21, Department of Corrections Incident Report by Major Latoya Brown at 2).

faith effort to maintain or restore discipline or maliciously or sadistically for the very purpose of causing harm." *Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir. 2005).

To determine whether force was applied "maliciously and sadistically," courts consider the following: "(1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them." *Campbell v. Sikes*, 169 F.3d 1353, 1375 (11th Cir. 1999). Each of those factors could be illuminated by the conduct of the persons involved at the very beginning of the use of force when Lee, fully restrained, is propelled into the wall and then onto the floor. In the absence of that video evidence, the finder of fact is forced back upon the contradictory testimony of the parties, which is grist for a jury's mill.

Punishments "involv[ing] the unnecessary and wanton infliction of pain" are "repugnant to the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 102–103, 97 S.Ct., at 290 (1976), *Hudson v. McMillian*, 503 U.S. 1, 10–11 (1992). "It is well settled that prison officials must take reasonable measures to guarantee the safety of the inmates, and a prison official violates the

Eighth Amendment prohibition against cruel and unusual punishment if the official is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury." *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (quoting *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016)).

A plaintiff must show objective "conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety." *Marbury*, 936 F.3d at 1233 (quoting *Lane*, 835 F.3d at 1307). A subjective component requires a plaintiff to show (1) the defendants' subjective knowledge of a risk of serious harm; (2) their disregard of that risk; and (3) conduct that is "more than mere negligence." *Swain*, 961 F.3d at 1285 (quoting *Lane*, 835 F.3d at 1308). *McCarley v. Dunn*, 722 F. Supp. 3d 1242, 1255 (N.D. Ala. 2024). The Eighth Amendment test for "deliberate indifference" is "subjective recklessness" as used in criminal jurisprudence. *Farmer*, 511 U.S. at 839; *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024). "[W]here a prison security measure is undertaken to resolve a disturbance … the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the purpose of causing harm." *Whitley v. Albers*, 475 U.S. 321-22 (1986).

See also *Rhodes v. Chapman*, 452 U.S. 337, 345 (1981): "Today the Eighth Amendment prohibits punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain' or are grossly disproportionate to the severity of the crime."

Defendants argue that Inmate Lee's episodes of non-compliance justified whatever force was used on him as a matter of law. In *Sconiers v. Lockhart*, noncompliance at one point didn't necessarily justify all force. As the court pointed out, the use of force may not always occur simultaneously with acts of non-compliance justifying the use of force. The existence of "both Lockhart's excessive use of force and Sconiers's resistance are not a logical impossibility." 946 F.3d 1256, 1269–70 (11th Cir. 2020).[7]

Given the chaos and the differing accounts of the participants, Defendants seek to rely on video recordings that tell part of the story but which are missing a critical part when Capt. White had the camera turned off. Surveillance video from afar showed officers pull Plaintiff forcefully into the opposite wall but not with the detail of the handheld camera.

In *Scott v. Harris,* the Court found that where "there are no allegations

---

[7] Here, *Heck v. Humphrey* does not apply since Lee was not convicted of any disciplinary charge. 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), It should be remembered that at the time of the initiation of force, Lee was completely restrained with leg shackles, handcuffs with black box and waist chain.

or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened," plaintiff's story was blatantly contradicted by the video and the court could rely on that rather than a plaintiff's account. 550 U.S. 372, 380 (2007).

In *Logan v. Smith et al.*, 439 11th Cir. 798 (2011): "In the context of cases involving video evidence, this Court will accept the video's depiction over the opposing party's account of the facts where the video obviously contradicts that version of the facts. But, even where the entire series of events is recorded, video evidence is not obviously contradictory if it fails to convey spoken words or tone, or fails to provide an unobstructed view of the events." Here, the video was missing critical moments and detail.

In *Pearson v. Taylor*, 665 11th Cir. 858 (2016): "To the extent that the video provides some reason to doubt the veracity of some aspects of Pearson's account, it is not so "blatantly contract[ory] that we may entirely disregard Pearson's version of events for purposes of summary judgment."

In *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313 (2010), the court found that "video is often not obviously contradictory because it fails to convey spoken words or tone and because it sometimes fails to provide an unobstructed view of events."

## B. Defendants present and able to intervene are not entitled to summary judgment if there is evidence they failed to intervene.

Plaintiff brings a claim in the alternative for failure to intervene in the use of force incidents thereby violating Plaintiff's Eighth Amendment rights to the extent that they failed to intervene to prevent the abuse though able. A jury could reasonably infer (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation. *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995).

It is true that a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 833, 114 S.Ct. 1970 (1994). The Farmer court found that "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." Id. at 842. "the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk … such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." Id. at 842-43.

## II. Defendants are not entitled to qualified immunity.

A "defense of qualified immunity is not available in civil rights lawsuits alleging excessive force in violation of Eighth Amendment." *Skrtich v. Thornton*, 280 F.3d 1295 (11th Cir. 2002). "[I]t is clearly established that all

infliction of excessive force on a prisoner sadistically and maliciously for the very purpose of causing harm and which does cause harm violates the Cruel and Unusual Punishment Clause. So, where this type of constitutional violation is established there is no room for qualified immunity." *Johnson v. Breeden*, 280 F.3d 1308, 1321 (11th Cir. 2002); *see also Garcia v. Austin*, No. 2:11-CV-56-FTM-29DNF, 2012 WL 3941777, at *10 (M.D. Fla. Sept. 10, 2012) ("A qualified immunity defense is not available for excessive use of force claims.").

Mr. Lee does not dispute that officers had the right to use some force to place him into the cell where he was willfully non-compliant. What he challenges is the officers' continued sadistic and malicious use of *excess* force and continued use of force when he could no longer resist.

Clearly there was strong animus against Lee. En route to E Dorm he accused Main Unit officers of physically abusing him in the past. (Escort Video at 14:20; Transcript at 3). He said officers there had tried to kill him. (Escort Video at 18:02; Transcript at 4). Officer Young, who joined the escort and was a defendant in the prior lawsuit, was "one of the main ones be doing that shit!" (Escort Video at 21:56; Transcript at 5.)

Mr. Lee shouted that he filed a lawsuit and won. (Escort Video at 21:15; Transcript at 4). He threatened to file a grievance. (Escort Video at 21:17;

Transcript at 4). As they neared the dorm, he refused to shut up and yelled "Motherfuckers tried to kill me! […] I'm telling the truth! You think I gotta hush boy, when I'm telling the truth?! You bitches tried to kill me! I ain't lying to nobody!" (Escort Video at 22:20; Transcript at 5).

Capt. White, defying protocol — *see* Major Brown's memos on "the severity" of White's violations — turned the handheld camera off before Mr. Lee got to the cell and could be placed in it, giving officers freedom to use excessive force. A reasonable jury could conclude that led to officers running Lee's head into the wall, smashing his face on the floor, hitting him twice in the head with a walkie talkie, and intentionally stepping on his neck and face, malicious and sadistic acts, done not to control him, but punish him for his verbal assault and his successful lawsuit. Given the seriousness of this abuse the officers do not merit qualified immunity.

And Lt. Grimm, a supervisor, failed to intervene and stop the malicious and sadistic acts by his subordinates. These acts were so horrific (e.g., smashing Lee's head twice with a walkie talkie while shackled) that a reasonable corrections officer would have known the officers' course of conduct was unconstitutional. *See Taylor v. Riojas*, 592 U.S. 7, 13 (2020) (finding no qualified immunity where conditions of confinement were so horrific that any reasonable officer should have known they were

unconstitutional). The Court should also deny Grimm qualified immunity.

### III.    Plaintiff is entitled to compensatory damages.

A "more than de minimis" physical injury is not required to survive summary judgment but is required to seek compensatory damages. While the term has not been clearly defined, an injury need not be significant. *Id*. There is "no consensus for how to determine when a physical injury is 'greater than de minimis.'" *Thompson v. Smith*, 805 F. App'x 893, 904 (11th Cir. 2020). An injury may be more than *de minimis* even if it falls short of requiring professional medical attention. *Id*. at 904.

"There certainly is no 'bright line' test for whether an injury is *de minimis*. Instead, this issue requires a fact-intensive inquiry." *Jones v. Schwarz*, No. 3:18-CV-155-LC/MJF, 2021 WL 1201675, at *13 (N.D. Fla. Feb. 16, 2021, J. Michael J. Frank), *report and recommendation adopted*, 2021 WL 1196463 (N.D. Fla. Mar. 29, 2021).

An injury certainly would be *de minimis* if it entailed only "a routine discomfort associated with confinement." *Thompson*, 805 F. App'x at 904. But here, Lee's short but brutal attack—not recorded by handheld camera— hardly left him with "routine" injuries. Mr. Lee suffered bad neck pain as a result of the Incident (Lee Depo. 27:2). In addition to extreme neck pain, he suffered scrapes on his arms, wrist, ankles and hip. (Lee Decl. at ¶ 2). Mr.

Lee repeatedly sought—and received—medical treatment for the injuries he received May 17, 2024 (the "Incident").

The same day, Mr. Lee was seen cell front soon after the use of force, complained of left wrist pain and requested to see a mental health provider (Doc. 78-11 at 66). Later that day he told medical staff that security stepped on his neck and that he had fallen on his head. (Doc. 78-11 at 61).

On May 20, 2024, Mr. Lee submitted an Inmate Sick-Call Request stating that due to the Incident, his neck "hurts extremely bad," his arms and both wrists hurt, and he had knots and bruises. (Doc. 78-11 at 54).

On May 23, 2024 a nurse prescribed Ibuprofen 600 mg and a muscle rub cream for Mr. Lee's pain. (Doc. 78-11 at 51-52). On June 4, 2024 a nurse saw Mr. Lee and ordered a sick call visit. (Doc. 78-11 at 50).

On June 3, 2024, Mr. Lee submitted an Inmate Sick-Call Request stating his neck was still sore from an officer putting his knee on his neck with all his weight while he was handcuffed and shackled. (Doc. 78-11 at 49).

On June 6, 2024, a nurse saw Mr. Lee regarding his neck, noted his symptoms were consistent with possible Torticollis[8], and prescribed a steroid

---

[8] "Torticollis, also known as wryneck or twisted neck, is a twisting of the neck that causes the head to rotate and tilt at an odd angle." Neck muscle pain or pain down the spine are common symptoms. *Torticollis (Wryneck),* Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/torticollis-wryneck. (Last accessed October 23, 2025.)

injection, Solu-Medrol 125 mg. (Doc. 78-11 at 46-47). On June 12, 2024, he submitted an Inmate Sick-Call Request stating that as a result of the May 17 Incident his "neck hurts so bad," that he'd been taking "K.O.P." (Keep On Person) medication 6 times a day, received a shot," which helped for three days, but now his neck hurts worse. (Doc. 78-11 at 38). He stated he was dizzy and weak and in extreme pain. (Doc. 78-11 at 38).

On June 12, 2024, a nurse ordered an x-ray with 2-3 views of Mr. Lee's cervical spine. (Doc. 78-11 at 39-40). On June 29, 2024, Mr. Lee's cervical spine was x-rayed, with 2 or 3 views. (Doc. 78-11 at 35). Dr. Yasser Mir reported "No acute fracture, dislocation or destructive bony process," but that an MRI was "clinically warranted." (Doc. 78-11 at 35).

On November 13, 2024, Mr. Lee submitted a Sick-Call Request complaining of ongoing neck pain due to the Incident six months prior, and stated that the steroid shot he received months ago helped for maybe two weeks but his pain still lingered, and that it hurts when he moves or lays down. (Doc. 84-1, Inmate Sick-Call Request 11.13.24).

Mr. Lee's back had already been "messed up from the longest since the last incident" but hurt even worse, as a result of this incident. (Lee Depo. 27:4-9). Mr. Lee testified 11 months after the Incident, that his neck was "still messed up from the injury" and that he could barely move his neck

27

sometimes. (Lee Depo. 12:7-8). Also as a result of the incident, Mr. Lee's legs were "real sore," his ankle would "hurt real bad," and he had a cut on his ankle, for which he did not get medical treatment, but which "scratched the skin real bad". (Lee Depo. 37:18-22). After the attack, Mr. Lee suffered dizziness for about 3 or 4 days. (Lee Decl. at ¶ 36).

Due to the attack, Mr. Lee continues to suffer pain from his lower back "all the way up," headaches, chronic neck pain, and pain in his arms. (Lee Decl. at ¶ 37). His right side collar bone and right shoulder still hurt, discomfort which comes and goes. (Lee Decl. at ¶ 37).

Defendants cite *Thompson v. Sec'y, Fla. Dep't of Corr.*, 551 F. App'x. 555, 557 n.3 (11th Cir. 2014), noting in a footnote that a Texas court defined a physical injury as "an observable or diagnosable medical condition requiring treatment by a medical care professional." Here, Mr. Lee received an x-ray, and was diagnosed and treated with Ibuprofen and a steroid shot by a medical care professional. Using the Defendants' own standard, Lee suffered more than *de minimis* injury.

A jury must be allowed to consider "the totality" of Lee's injuries to determine whether "they are more than de minimis because they go beyond the routine discomforts of confinement." *See Wright v. Grant*, No. 1:20-CV-96-AW-GRJ, 2021 WL 3934248, at *9 (N.D. Fla. July 7, 2021), R&R *adopted*,

2021 WL 3931979 (N.D. Fla. Sept. 2, 2021) (holding that reasonable jury might find "the totality" of prisoner's injuries from chemical agent more than *de minimis* ). Here, a jury could find the totality of Lee's injuries, including bruises, scrapes, a cut, dizziness, and chronic neck and back pain to be more than *de minimis*,

Courts typically consider minor cuts and bruises to be *de minimis* physical injuries. *See, e.g.*, *Dixon*, 225 F. App'x at 799 ("[M]ere bruising from the application of restraints is only a de minimis injury.") *But see Law v. McDaniel*, 2008 WL 4371771, at *3 (D. Nev. Aug. 20, 2008) (inmate kicked in the stomach and who suffered bruised ribs but was "not seriously injured" had sufficient injuries to survive motion to dismiss stage; whether or not the injury was "serious" enough in the legal sense was a factual issue that should be decided based upon evidence).

Abrasions and bleeding can be more than de minimis. *See Evans v. Alameida*, 2006 WL 618298, at *1 (E.D. Cal. Mar. 10, 2006), *report and recommendation adopted*, 2006 WL 1774875 (E.D. Cal. June 26, 2006) (order on motion for summary judgment noting prior decision that "abrasions and bleeding" were not de minimis).

Back pain which persisted at least a year can be more than de minimis. *See Benoit v. Bordelon*, 596 F. App'x 264, 269 (5th Cir. 2015) (cited by

29

*Wilson v. Johnson*, No. 4:18-CV-310-RH-MJF, 2020 WL 3052530, at *19 (N.D. Fla. Mar. 31, 2020), *report and recommendation adopted*, 2020 WL 3050229 (N.D. Fla. June 8, 2020)). Here, Lee continues to suffer neck and back pain.

In *Wilson v. Johnson*, 2020 WL 3052530, at *19, *supra,* the court found that the evidence, "viewed in its entirety," was sufficient for a reasonable jury to find that the alleged injury—"being hit with closed fists, which caused [the prisoner] to fall backwards onto a concrete slab and resulting in continued lower back pain that has lasted for over one year and is being treated with pain relievers and analgesic balm—is not a 'routine discomfort' associated with confinement, and amounts to a greater than *de minimis* physical injury."

Lee's head was bashed into a wall, his face smashed onto the floor, and his neck stepped on, resulting in neck and back pain that has lasted well over a year. If there is any dispute over the nature and extent of his injuries then it should be for a jury to decide whether they are *de minimis*.

## IV.    Defendants are not entitled to dismissal of Plaintiff's request for punitive damages.

Finally, Defendants asks the Court to strike Plaintiff's claim for punitive damages as "prospective relief" that is not "narrowly drawn" under 18 U.S.C. §3626(a)(1)(A). But the Eleventh Circuit, contrary to Defendants' argument, has specifically interpreted 18 U.S.C. § 3626(a)(1)(A) as not barring punitive

damages in a federal rights violation action. *Johnson v. Breeden*, 280 F.3d 1308, 1325-26 (11th Cir. 2002); *Hoever v. Marks*, 993 F.3d 1353, 1361 (11th Cir. 2021) (en banc) ("Congress simply did not choose to provide a restriction on punitive damages" in the PLRA context).

The Florida Attorney General's Office has advanced this argument in countless cases. And there is no dearth of decisional authority rejecting Defendants' argument. *See, e.g.*, *Bowden v. Cattnach*, 2023 WL 8261402, at *4 (N.D. Fla. Sept. 25, 2023), R&R adopted, 2023 WL 8257968 (N.D. Fla. Nov. 29, 2023) ("no countervailing authority to support [defendants'] interpretation of § 3626(a)(1)(A)"; "the Court finds that § 3626 does not impose a categorical prohibition on an award of punitive damages"); *Smith v. Williams*, 3:23-CV-5661/TKW/ZCB, 2024 WL 4438320, at *5 (N.D. Fla. 2024), R&R adopted, 2024 WL 4434798 (N.D. Fla. 2024) (argument "lacks merit for the reasons explained in multiple other opinions"); *Santiago v. Walden*, 3:23-CV-741-MMH-JBT, 2024 WL 2895319, at *9 (M.D. Fla. 2024) ("the Court declines to find that § 3626 precludes a request for punitive damages in this § 1983 action"); *Santiago v. Lizenbee*, 2023 WL 7323137, at *3 (M.D. Fla. 2023) ("the Court cannot disregard the Eleventh Circuit's long-standing recognition that punitive damages are available in prisoner civil rights actions."); *Wilson v. Ingram*, 2025 WL 1187188, at *6 (N.D. Fla.

2025), R&R adopted, 2025 WL 1109020 (N.D. Fla. 2025) (denying summary judgment on this issue); *Miller v. Willis*, 2024 WL 2815641, at *6 (M.D. Fla. 2024) (finding defendants' section 3626 punitive damages "argument unconvincing"); *Walker v. Bailey*, 2024 WL 3520868, at *9 (M.D. Fla. 2024), reconsideration denied, 2024 WL 4284978 (M.D. Fla. 2024) ("The Court also finds persuasive other district court decisions explicitly finding that § 3626(a)(1)(A) does not preclude an award of punitive damages in prisoner civil cases."); *Burton v. Smith*, No. 3:23-CV-1195-BJD-SJH, 2024 WL 4881264, at *2 (M.D. Fla. 2024) ("the Court cannot disregard the Eleventh Circuit's long-standing recognition that punitive damages are available in prisoner civil rights actions"); *Blake v. Ortega*, 2024 WL 2000107, at *4 (N.D. Fla. 2024), R&R adopted, 2024 WL 1996014 (N.D. Fla. 2024) ("the current state of the law does not support the conclusion that section 3626 imposes a categorical prohibition on an award of punitive damages"); *Hart v. Lt. Hardbower*, 2024 WL 4497117, at *3 (N.D. Fla. Sept. 17, 2024), R&R adopted, 2024 WL 4495507 (N.D. Fla. 2024) (same).

This Court should reject it too.

Further, even if the Court were inclined to agree with Defendants, their request is premature. Contrary to Defendants' position, a jury should be permitted to assess punitive damages in a section 1983 case when the

Defendant's conduct involves reckless or callous indifference to federally protected rights, as well as when it is motivated by evil motive or intent. *Smith v. Wade*, 461 U.S. 30, 56 (1983). Given that Plaintiff has alleged conduct that, if proven, can satisfy an award of punitive damages—that, *inter alia*, officers maliciously bashed his head into a wall and slammed his face on the floor—, the Court should dispense with Defendants' argument at this stage. Whether such punitive damages are "narrowly tailored" under the PLRA should be resolved at trial after liability is determined. *See, e.g., Key v. Kight*, 2017 WL 915133, at *8 (S.D. Ga. Mar. 8, 2017), R&R adopted, 2017 WL 1128601 (S.D. Ga. Mar. 24, 2017) (concluding that punitive damages were "prospective relief" under the PLRA and recommending an award of punitive damages in the amount of $25,000 on a motion for entry of default judgment); *Benton v. Rousseau*, 940 F. Supp. 2d 1370, 1379-80 (M.D. Fla. 2013) (finding prisoner was entitled to $15,000 in punitive damages for violation of First and Fourteenth Amendment rights); *Pierre v. Johnson*, 2024 WL 4116530, at *2 (N.D. Fla. 2024), R&R adopted, 2024 WL 4107478 (N.D. Fla. 2024) (request at dismissal stage premature)

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court DENY Defendants' Motion and set this matter for trial.

Respectfully Submitted,    */s/ James V. Cook*
JAMES V. COOK (FBN 0966843)
Law Office of James Cook
314 West Jefferson Street
Tallahassee, FL 32301
(850) 222-8080; 561-0836 fax
cookjv@gmail.com

*/s/ Joshua Tarjan*
Joshua Tarjan (FBN 107092)
The Tarjan Law Firm P.A.
12372 SW 82 Avenue
Pinecrest, FL 33156
(305) 423-8747
(323) 243-3186 (cell)
(786) 842-4430 (fax)
josh@tarjanlawfirm.com

*Attorneys for Plaintiff*

I CERTIFY the foregoing was filed electronically on 10/24/2025, serving

counsel of record registered with the CM/ECF electronic filing system.


I CERTIFY the total number of words excluding case style, signature block,

and certificate of service is 7,962.


*/s/James V. Cook*