UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ROBERT SINCLAIR LEE,

    Plaintiff,

v.                                               Case No. 3:24cv321-TKW-HTC

JACOB GRIMM, et al.,

    Defendants.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Robert Sinclair Lee, a prisoner at Santa Rosa Correctional Institution ("SRCI"), filed an amended civil rights complaint under 42 U.S.C. § 1983, alleging Defendants used excessive force while they were transporting Lee between cells at SRCI. Doc. 11. Pending before the Court is Defendants' Motion for Summary Judgment. Doc. 78. After considering the motion, Lee's response (Doc. 85), Defendants' reply (Doc. 89), the record, and the relevant law, the undersigned recommends the Motion for Summary Judgment be DENIED.

**I.    LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion

for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  An issue of fact is "material" if it might affect the outcome of the case under the governing law, and it is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.*  The Court must review the evidence, and all factual inferences reasonably drawn from the evidence, "in the light most favorable to the non-moving party." *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993) (citation omitted).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citation omitted).

## II.  THE USE OF FORCE INCIDENT

Lee alleges that Defendants Coates, Gerencser, Grimm, Hartley, Perkins, Trumble, White, and Young, correctional officers with the Florida Department of Corrections, used excessive force or failed to intervene to stop the use of excessive force against him.  Specifically, as set forth in his Declaration (Doc. 90-1) and sworn First Amended Complaint (Doc. 11), Lee alleges the following occurred on May 17, 2024, at SRCI:

At approximately 11:30 a.m., Defendant Hartley approached Lee's cell at the SRCI Annex and informed him that officers were going to move him to the Main

Unit. Lee expressed his concern, including his fear of Main Unit staff and officers due to a lawsuit he had filed against them and for which he received a "small settlement." Doc. 90-1 at 1. Lee asked Hartley to call the captain and mental health. Captain White told Lee he was "going to the Main Unit by force" or he "could make the right choice and go freely."[1] *Id.* at 2.

Defendants White, Hartley, and Grimm "came to administer chemical agents with the hand-held use of force camera." *Id.* Grimm gave Lee three minutes to comply with the order to transfer cells. Lee told Grimm he would comply if he was escorted on camera to the new location. White and Grimm instructed Hartley to "place shackles, handcuffs, a black box and waist chains" on Lee. *Id.* at 3.

After entering the Main Unit compound, Defendants Young and Coates "both joined in to escort" Lee. *Id.* When they got to E Dorm, Captain White stopped the video recording, although Lee made him aware he "only agreed to go to the Main Unit to avoid getting sprayed with gas and that [he] had not changed [his] objection to being placed in a cell in the Main Unit with another inmate." *Id.* Once in E-2, Lee noticed Officers Trumble, Perkins, and Gerencser waiting for him at cell E-2102. By that time, Lee "had an escort of four officers, and … saw three more waiting." *Id.*

---

[1] Mental health specialist Garcia, who is not a defendant, also came to the cell and spoke with Lee. Although Lee complained about his fear of going back to the Main Unit based on prior events there, Garcia told him all she could do was document the problem. Doc. 11 at 9; 90-1 at 2.

Case No. 3:24cv321-TKW-HTC

Lee knew someone was in the cell already and told Hartley, Young, and Perkins that he refused to go into the cell. Hartley, Young, Trumble, and Gerencser then "violently slammed [Lee's] head into the wall, causing [him] extreme pain in [his] head and neck, and to feel drunk-like and woozy." *Id.* at 4. They then "rushed [Lee] head first about five steps and slammed [him] face first on the floor, causing [him] tremendous pain." *Id.* Young then "deliberately slammed" his knee into Lee's neck "with excessive force," causing him "tremendous pain." *Id.* Lee thought he was going to die. Young "palmed" Lee's face "to the concrete with all his weight pressed down on [him], which was extremely painful." *Id.*

Defendants Grimm, Perkins, Coates, Trumble, Young, Gerencser, and Hartley were all yelling for Lee to stop resisting, but he "was not resisting." *Id.* Hartley hit Lee twice in the face and head with his "heavy, brick-like, standard FDC issue walkie-talkie with malicious intent to cause serious physical, mental and emotional pain and suffering." *Id.* The other seven Defendants failed to intervene when Hartley hit Lee with the walkie-talkie, even though they were "all in a position to do so and had time to do so at least by the second blow." *Id.*

Defendants Perkins and Coates were twisting Lee's ankles and "pulling on [his] shackles, trying to break [his] ankles." *Id.* at 5. The other six Defendants were in a position to intervene but failed to do so. Young, Hartley, Trumble, and Gerencser were "violently twisting" Lee's body, "snatching on the waist chain, and

bending [his] wrist against the handcuffs backwards, attempting to break [his] wrist." *Id.* Young, Hartley, and Gerencser "took turns" twisting Lee's wrist. *Id.* Hartley tried to break his wrist. Trumble assisted them, pulling on Lee's arm. Because he was in restraints, he was "incapacitated and could not move when [he] was on the floor being attacked." *Id.* at 8.

Hartley grabbed Lee by the neck and head while Gerencser, Young, Trumble, and Perkins "dropped" Lee on his stomach. *Id.* at 5. They all ran out of the cell, leaving Lee on the floor in pain. Captain White summoned the prison nurse on duty "minutes later" to do a "visual body check" but she could not do so because Lee was behind the steel door of the cell, and she could not see him.

Because of the Defendants' actions, Lee "suffered extreme neck and back pain, and scrapes on [his] arms, wrist, ankles and hip." *Id.* He was "mentally anguished and emotionally distressed due to this attack." *Id.* at 6. As a result, Lee saw the prison doctor three times. The first time, he was prescribed "600mg Ibuprofen (keep on person) for 90 days, plus Tylenol," for his neck pain; the second time, he received a "125mg shot of SoluMedrol, a steroid for [his] neck pain"; and the third time, an x-ray was ordered for his neck. *Id.* at 6-7. Lee also suffered dizziness "for about 3 or 4 days" following the attack and "was extremely tired." *Id.* at 6. Lee continues to suffer pain from his "lower back all the way up to [his] neck,

headaches, chronic severe neck pain, and pain in [his] arms." *Id.* at 6.  His right-side collar bone and right shoulder "still hurt, discomfort which comes and goes." *Id.*

### III. DISCUSSION

#### A. There is a material dispute of fact as to whether Defendants used excessive force.

In Eighth Amendment excessive force claims, the "core judicial inquiry" is "not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).  In determining whether force was applied maliciously and sadistically to cause harm, a court considers: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted upon the prisoner; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of a forceful response. *Whitley v. Albers*, 475 U.S. 312, 321 (1986).  In addition, "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance." *Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002) (citations omitted); *see also Velazquez v. City of Hialeah*, 484

F.3d 1340, 1342 (11th Cir. 2007) (rejecting view that arrestee must specify the actions of each alleged participant in a collective beating).

Lee does not contest that the Defendants had the right to use force to place him in cell E-2102 because he was non-compliant. He contends, however, that the force used was excessive—more than necessary—once he ceased resisting. Defendants, on the other hand, contend that they are entitled to summary judgment based on the video evidence. Specifically, they argue the video evidence shows Lee continued to resist while force was being used and contradicts Lee's contention that Defendants "maliciously and sadistically" used force to cause him harm. Doc. 89 at 3. Thus, Defendants contend the Court cannot accept Lee's version of events.

When video evidence "blatantly contradicts" the plaintiff's version of events in an excessive force case, the court should not adopt the plaintiff's version when ruling on a motion for summary judgment. *See e.g., Scott v. Harris*, 550 U.S. 372, 380 (2007). Here, however, none of the video evidence provided by the Defendants clearly depicts the entire use of force incident.[2] As discussed below, the handheld video footage stops immediately before the use of force incident and does not start again until almost two minutes after use of force began. And the footage from the

---

[2] Defendant submitted five video exhibits, Exhibits A-E. Exhibits A, C and E are discussed herein. Exhibit B, which is the footage from the fixed wing camera at the front door of Wing 2 of Echo Dormitory, only shows Lee entering the dayroom area. Exhibit D, which is the fixed wing video from the dayroom, shows only the backs of the Defendants during the use of force incident and is too far away to show what any of the Defendants or Lee are doing with any clarity. Also, the fixed wing videos do not include any audio.

Case No. 3:24cv321-TKW-HTC

fixed wing cameras is either too grainy or too far away to discern what any of the Defendants or Lee are doing.

Exhibit A, which is a handheld video, begins at 1:02 p.m. and runs for more than 23 minutes.[3]  It starts with Defendant Grimm stating that the use of chemical agents against Lee has been approved because Lee is refusing to submit to an unclothed search and exit his cell for dorm reassignment.  Lee, however, subsequently agrees to cooperate, eliminating the need for officers to administer chemical agents.  The video nonetheless continues and captures Lee's escort from the Annex to the Main Unit's E dormitory.  During much of the escort, Lee can be seen and heard combatively yelling at officers, including yelling profanities at them, and telling them that he does not want to be moved to E dormitory or be in a cell with someone else.

Once inside E dormitory, and as Lee and some of the Defendants head near the E-2102 cell, Lee says "I'm not going in there," (Exhibit A, at 23:14) and, at that moment, Officer Vega turns the camera away from Lee and the escorting officers to Defendant White (*Id.* at 23:19) who is reading a closing script.  A few seconds later (*id.* at 23:34), Lee can be heard screaming in the background, but the camera remains

---

[3] The handheld video camera was operated by Officer Vega, who is not named as a defendant.

focused on Defendant White, who turns off the camera.[4] *Id.* at 23:35. Exhibit A, therefore, does not capture the use of force incident.

Exhibit E is a continuation of the handheld video, but does not begin until 1:27 p.m., almost two minutes after the use of force incident began. This video captures Lee lying in the threshold of E-2102 cell and yelling. However, because Defendants are either standing over or laying on top of Lee, their interactions are not clearly depicted in the video. About one minute and twenty-seven seconds after the video begins, Lee is placed back in the cell and all use of force ceases. Exhibit E at 1:27.

Exhibit C, which is the control fixed wing video, captures the entire use of force incident but does so from a distance. Thus, it is not clear from the video what force Defendants are using. Moreover, while Lee is seen refusing to go into the cell and pulling away from Defendants initially, it is not clear when or if Lee ceased resisting.

Because none of the video evidence clearly depicts the entire use of force incident, the undersigned cannot say that evidence blatantly contradicts Lee's version of events. *See Logan v. Smith et al.*, 439 F. App'x 798, 800 (11th Cir. 2011)

---

[4] Captain White and Officer Vega were reprimanded for failing to capture the entire use-of-force incident on camera. *See* Doc. 78-8 at 12 ("Captain White was also spoken with about the importance of ensuring all events are captured in their entirety and the appearance of impropriety in the way the events unfolded."); *see also* Doc. 84-3 at 2 ("COT Vega was not trained properly on handheld camera usage [and] lost visual of the inmate Lee while inside of the cell.").

("even where the entire series of events is recorded, video evidence is not obviously contradictory if it fails … to provide an unobstructed view of the events") (citing *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) (declining to wholly discredit plaintiff's version of the events where video evidence lacked sound and was periodically obstructed)).  In other words, the video footage provided by Defendants does not "so utterly discredit[]" Lee's version of events "that no reasonable jury could have believed him."  *See Scott*, 550 U.S. at 380.  Thus, accepting Lee's sworn allegations as true,[5] the undersigned finds there are genuine disputes of material fact as to whether Defendants used more force than necessary to restrain Lee and move him into his new cell.  *See Wromas v. Mursch*, No. 3:20CV02698/MCR/ZCB, 2023 WL 11937244, at *5 n.5 (N.D. Fla. June 28, 2023) (recommending denial of motion for summary judgment on excessive force claim because "the video evidence does not wholly corroborate either party's version of events surrounding the uses of force").

Also, because questions of material fact exist regarding whether excessive force was used, those same questions of fact preclude the entry of summary judgment on Lee's failure to intervene claims.  All Defendants were present at the

---

[5] It is well settled that at the summary judgment stage, the Court cannot make credibility determinations and must instead review the facts in the light most favorable to the non-moving party. *See e.g., Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations [at summary judgment]; the non-movant's evidence is to be accepted for purposes of summary judgment.").

time force was used, and Lee's declaration indicates the Defendants had the opportunity to intervene. Thus, if a jury concludes that any of the Defendants used excessive force, then the others could be liable for failing to intervene. *See Alston v. Swarbrick*, 954 F.3d 1312, 1321 (11th Cir. 2020) ("'An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force' can be liable for failing to intervene, so long as he 'was in a position to intervene yet failed to do so.'") (quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1330-31 (11th Cir. 2008)).

### B. Defendants are not entitled to qualified immunity.

Defendants argue judgment should be entered in their favor because they are entitled to qualified immunity. Qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would be aware. *Myrick v. Fulton Cnty., Ga.*, 69 F. 4th 1277, 1300 (11th Cir. 2023). However, generally, "a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court

decisions in *Hudson* and *Whitley*."[6] *Skrtich*, 280 F.3d at 1301 (internal citations omitted).

As explained above, the undersigned finds there is a genuine dispute of material fact regarding whether Defendants violated the Eighth Amendment by using excessive force and failing to intervene. And, because "a reasonable jury could find [Defendants] violated [Plaintiff's] Eighth Amendment rights, [Defendants] are not entitled to qualified immunity." *Bowden v. Stokely*, 576 F. App'x 951, 955 (11th Cir. 2014). Thus, Defendants are not entitled to summary judgment based on qualified immunity.

### C. Lee is not barred from seeking damages.

#### 1. Compensatory Damages

Defendants argue Lee is not entitled to compensatory damages because he "fails to state a physical injury which is greater than *de minimis*." Doc. 78 at 22. Specifically, Defendants argue (1) a "review of [Lee's] medical records demonstrates that he did not have any injuries on May 17, 2024" (Doc. 78 at 26), (2) Lee's examination immediately after the use of force did not show "observable

---

[6] Defendants argue *Skrtich* is inconsistent with Supreme Court precedent. Citing *Hope v. Pelzer*, 536 U.S. 730 (2002), they claim prison officials who violate the Eighth Amendment by using excessive force may nonetheless be shielded from liability if their actions did not violate clearly established law. Doc. 89 at 4-5. However, *Hope* does not support that argument because it involved a deliberate indifference claim related to an inmate's conditions of confinement. 536 U.S. at 737-38 ("In making this determination in the context of prison conditions, we must ascertain whether the officials involved acted with 'deliberate indifference' to the inmates' health or safety.").

injuries," and his subsequent medical assessments on May 23, June 6, and June 12 revealed only "mild sternocleidomastoid muscular pain from muscle strain" and "possible torticollis" (Doc. 78 at 26-7), and (3) an aggravation of a pre-existing injury is not more than *de minimis*.

Under 42 U.S.C. § 1997e(e), a prisoner must prove he suffered a more than *de minimis* physical injury to recover compensatory damages. *Thompson v. Smith*, 805 F. App'x 893, 900-01 (11th Cir. 2020) (citation omitted). To surpass the *de minimis* threshold, an injury must generally be "an observable or diagnosable medical condition requiring treatment by a medical care professional." *Thompson v. Sec'y, Fla. Dep't of Corr.*, 551 F. App'x 555, 557 n.3 (11th Cir. 2014) (quoting *Luong v. Hatt*, 979 F. Supp. 481 (N.D. Tex. 1997)). Here, the undersigned finds a genuine issue of material fact exists as to whether Lee suffered a more than *de minimis* injury from the Defendants' use of force.

When there is a conflict between medical records and a prisoner's affidavit, the conflict cannot be resolved automatically in favor of the medical records. *See Reid v. Sec'y, Fla. Dep't of Corr.*, 486 F. App'x 848, 852 (11th Cir. 2012) ("While it is true that [the inmate's] medical records do not support the version of the facts he presents in his affidavit, all this means is that there is conflict in the evidence, which we must resolve at the summary judgment stage in [the inmate's] favor."). Lee has consistently cited the May 17 incident as the source of his neck pain. *See*

Doc. 78-10 at 54 (May 20, 2024, Sick Call Request); *id.* at 49 (June 3, 2024, Sick Call Request); *id.* at 38 (June 12, 2024, Sick Call Request); Doc. 84-1 (November 13, 2024, Sick Call Request). And Lee declares that his "chronic severe neck pain" is ongoing, which takes his injury beyond a mere aggravation of a preexisting condition. Doc. 90-1 at 6. Thus, while temporary neck pain alone would not generally constitute more than a *de minimis* injury, the evidence indicating Lee continues to experience medically-treated neck issues caused by the May 17 incident for over a year after the incident is sufficient to cross the more than *de minimis* threshold and survive summary judgment. *See Flanning v. Baker*, 2016 WL 4703868, at *7 (N.D. Fla. Aug. 16, 2016), *report and recommendation adopted*, 2016 WL 4703862 (N.D. Fla. Sept. 7, 2016) ("Because a genuine dispute of material fact exists concerning whether plaintiff's injuries were *de minimis*, summary judgment is not appropriate on the issue of compensatory … damages.").

    2.    <u>Punitive Damages</u>

Defendants argue the Prison Litigation Reform Act ("PLRA") bars Lee's request for punitive damages. The PLRA states:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall

give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A).

Punitive damages are included within the definition of "prospective relief" used in the statute. *See Johnson v. Breeden*, 280 F.3d 1308, 1325 (11th Cir. 2002), *abrogated on other grounds by Kingsley*, 576 U.S. at 395.

Defendants claim punitive damages categorically cannot satisfy the requirements of 18 U.S.C. § 3626(a)(1)(A) because: (1) "'correction' of a violation [of a federal right] accomplished through compensatory damages and punitive damages are, by their nature, never corrective"; (2) punitive damages cannot be "narrowly drawn"; and (3) punitive damages are "never the 'narrow[est]' or 'least intrusive' way of effectuating such a correction" of a violation of a federal right. Doc. 78 at 32-33. However, Defendants cite no cases that hold § 3626 prohibits the assessment of punitive damages in prison conditions cases. And the Eleventh Circuit case they do cite, *Johnson*, indicates punitive damages are permitted in prison conditions cases.[7] *Johnson*, 280 F.3d at 1325 (finding § 3626's "requirements mean that a punitive damages award must be no larger than reasonably necessary to deter

---

[7] The undersigned recognizes Defendants' argument that the Eleventh Circuit in *Johnson* did not consider whether § 3626 bars punitive damages, nor has the issue ever been squarely addressed by the circuit court. *See Hoever v. Marks*, 993 F.3d 1353, 1364 n.5 (11th Cir. 2021) ("We decline the government's invitation to address the availability of punitive damages in prison condition cases under 18 U.S.C. § 3626, as it falls outside the scope of the en banc briefing question posed to the parties.").

Case No. 3:24cv321-TKW-HTC

the kind of violations of the federal right that occurred in the case" and "that such awards should be imposed against no more defendants than necessary to serve that deterrent function and that they are the least intrusive way of doing so").

Thus, the current state of the law does not support the conclusion that § 3626 imposes a categorical prohibition on an award of punitive damages. *See Hoever v. Marks*, 993 F.3d 1353, 1364 (11th Cir. 2021) (holding "that § 1997e(e) permits claims for punitive damages without a physical injury requirement"); *Benton v. Rousseau*, 940 F. Supp. 2d 1370, 1379-80 (M.D. Fla. Mar. 19, 2013) (finding prisoner was entitled to $15,000 in punitive damages for violations of his First and Fourteenth Amendment rights). Accordingly, Lee may pursue punitive damages in this case.

## IV. CONCLUSION

Accordingly, it is RECOMMENDED that:

1. Defendants' motion for summary judgment (Doc. 78) be DENIED.

2. This case be referred to the undersigned for further pretrial proceedings on Lee's Eighth Amendment excessive force and failure to intervene claims.

At Pensacola, Florida, this 29th day of December, 2025.

/s/ Hope Thai Cannon
**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within **fourteen (14) days** of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> An objecting party must serve a copy of its objections upon all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1.