UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| ROBERT SINCLAIR LEE,<br><br>    Plaintiff,<br><br>v.<br><br>CAPTAIN J. WHITE, *et al.*,<br><br>    Defendants. | Case No. 3:24cv321-TKW-HTC |

**PLAINTIFF'S STATEMENT OF FACTS**

Robert Sinclair Lee, in accordance with this Court's order [ECF No. 95], hereby submits his Statement of Facts.

On May 17, 2024, Robert Lee was a Florida state prison inmate at Santa Rosa Correctional Institution Annex.

TRANSFER INITIATED

Between 11:00 am and 1:00 pm, Officer Gabriel Hartley told Mr. Lee he was getting transferred to the Main Unit. Lee said he couldn't go there because he previously sued staff who still worked there and was in fear for his life. Mr. Lee told Hartley he feared officers currently working at the Main Unit due to a lawsuit Lee had previously filed against them in which he had received a modest recovery.

1

This lawsuit, filed in the United States District Court in the Northern District of Florida, Pensacola Division, is *Robert Sinclair Lee v. Lieutenant T. McCranie, et al.*, 3:20-cv-05462-MCR-HTC.

Mr. Lee asked Hartley to call the captain and mental health staff to let them know he was in fear for his life.

Captain Jack White arrived with a mental health employee, to whom Mr. Lee explained his fear.

Captain White told Mr. Lee he was going to the Main Unit by force or that Lee could make the right choice and go freely.

Mr. Lee explained to Mental Health Counselor Angel Garcia what occurred four years ago at Santa Rosa Main Unit and that he was now suffering extreme anxiety after being held down and brutally beaten by five guards at the Main Unit. Mr. Lee told Garcia his fear that if he returns to the Main Unit, officers will hurt him again, as they had threatened. Garcia said she could do nothing but document what he said. Mr. Lee explained to Garcia he was suffering from and had been prescribed medication for anxiety disorder.

Mr. Lee said he wanted officers to get the (handheld) camera, so he could talk on camera about what happened previously. He told Lt. Jacob Grimm he would comply with the escort once he said what he had to say.

2

Capt. White, Officer Hartley and Lt. Grimm came to administer chemical agents with a hand-held use of force camera.

At approximately 1:02 pm, in K Dorm, Officer Steven Vega, using the handheld camera, began recording Lt. Grimm, who instructed Vega:

> I am instructing you to position yourself in a manner that allows you to capture all events that occurred during this incident and to reposition yourself if necessary to capture these events and to continue recording until I instruct you otherwise.

Grimm stated on camera, "I will now attempt to resolve the disturbance by counseling with inmate Lee," and to only use chemical agents if necessary, "after all reasonable, non-force intervention efforts have failed."

Grimm then ordered Lee to "get out the door" and warned Lee to submit to an unclothed search and wrist restraints, and exit his cell for cell reassignment. Grimm advised that if Lee continued to refuse, chemical agents would be administered.

Lee agreed to comply, stating:

> I am willing to comply with that order. And I would ask the camera to escort me all the way to the main unit on camera. I comply with that order, sir. I comply with that order on camera. You will take me to main unit with the camera on me. I comply with that order sir. That way maybe I can address my issue on camera, you know. […] Maybe I can get my point across by the time I get over there to Echo Dorm.

3

Lee added, "I need the camera on me the whole way while I get escorted."

Mr. Lee stated that officers at the (Main Unit) had previously tried to kill him, that he wanted to talk to the camera "'Cause it could get uglier; it did before."

Mr. Lee stated that when officers there tried to kill him they tried to rip his eyeballs out of his head, beat him with handcuffs badly, and kicked him in the face, and that he suffered a concussion.

Mr. Lee complied with Hartley's search commands and order to kneel, whereupon Hartley and another officer placed leg shackles, handcuffs, a black box and waist chains on Mr. Lee.

Grimm then announced they were heading to Echo Dorm, and Lee was escorted outside.

## ESCORT

During the escort, Mr. Lee asked how he was supposed to feel safe when officers beat him up badly where he is going. Lee repeated that officers tried to kill him the first time he was at the Main Unit.

Officers Young and Coats joined in the escort.

En route, Mr. Lee came across Lt. Cattnach, and protested the abuse Cattnach had committed against him, including beating him with handcuffs. He mentioned Cattnach was a defendant in the prior lawsuit Lee had settled.

As they approached Dorm E, Mr. Lee became more upset. Hartley told him to "hush." Lee said "Ain't no hush! Scared for my motherfuckin' life! Y'all got me fucked up man! Cause I'm filing a grievance about it […]"

As they neared the dorm, Mr. Lee stated:

> This has got me back here. Motherfuckers tried to kill me! Fuck if I ain't gotta hush my mouth. Gotta hush my mouth, man! I'm telling the truth! You think I gotta hush boy, when I'm telling the truth?! You bitches tried to kill me! I ain't lying to nobody!

Inside the building, Lee repeatedly stated he was not going into a cell with anybody, and after entering the dorm dayroom stated "I'm not going in there."

Throughout the escort, the camera operator had remained behind Mr. Lee. But as Lee was escorted through a chain link barrier into the housing area, Capt. White indicated for the camera to turn toward him. The camera swiveled away from Mr. Lee to face Capt. White, who announced:

> Camera operator, inmate Lee complied with all of our orders issued. No force was utilized during this incident. Camera operator, state your name, date, and time as [unintelligible] on the handheld video camera.

5

Mr. Lee at this point was off camera. White gave the date and time, which was not displayed on the video, as May 17th, 2024, 1:26. Mr. Lee was now heard screaming off camera. But White reached toward the camera to turn it off, and the recording ended.

ENTERING ECHO DORM: FIXED WING VIDEO

In addition to viewing the handheld camera video, the jury will view a single fixed wing video.

As Lee was escorted into Echo Dorm, a group of officers was already waiting in front of the cell. At this point, with the hand-held camera off, the only video witnessing the action was a surveillance camera at the other end of the Dorm. The video is low resolution and it is possible to make out human shapes but not identify any individual or to pick anyone out from a group of people standing close together.

In the surveillance video, officers are standing at a cell front across from a metal stair going up to the second tier. Others, including Lee, are entering through the doorway and walking toward the cell. At some point the video shows a blurred mass of people move toward and then away from the staircase, and then quickly across the floor, stopping suddenly at the wall. It is no longer possible to tell with any clarity what is happening except through the conflicting narratives of witnesses, including Mr. Lee.

Mr. Lee will testify, for example, that he was violently slammed head-first into the wall and then to the floor face-down, Young deliberately slammed his knee onto Lee's neck, and Hartley hit him in the head twice with a walkie- talkie, causing tremendous pain.

### SECOND HANDHELD VIDEO: USE OF FORCE

Approximately one minute after being switched off, the handheld camera restarted, with Capt. White inside the housing area near Lee's cell. Nearby the doorway to cell 2102, a mass of officers can be seen on the ground. Mr. Lee is not clearly visible under the dogpile. White gives the date and time on camera: 1:27 pm. The camera then turns to show officers on and around Mr. Lee, on the ground. Off camera, White says that "at approximately 1:26 pm reactionary physical force was utilized [unintelligible] inmate Lee [unintelligible] unlawful commands [unintelligible] refusal to enter the cell." White states that force was used by Young, Perkins, Gerencser, and Hartley.

It was during the approximately one-minute gap in filming, that officers began to use excessive force on Mr. Lee.

### THE EXCESSIVE FORCE

When Mr. Lee arrived in the dorm, Lee saw Sgt. Perkins and Officers Trumble and Gerencser at the cell door where he was to be housed. Lee will

7

testify that there are usually two officers on an escort like his, but now the group had grown to nine officers. Lee told them that he wasn't going in the cell with anybody, because there's so much that had happened. Defendants will testify that they were aware before entering Echo Dorm (and before the hand-held camera was turned off) that Lee would resist being placed in a cell with another inmate.

    Mr. Lee was scared to be housed with another inmate because officers had tried to get inmates to kill him when he was there the last time, by giving other inmates knives.

    Lee will testify that, previously, officers at the Main Unit had given a prior cell mate a knife and asked him to stab Lee. Instead, the cell mate showed him the knife and told him about the officers' order. Mr. Lee will testify that officers at the Main Unit had called Lee a "snitch" in front of gang members, which was an invitation to them to do him harm.

    At this point, on the day of the incident that is the subject of this lawsuit, Mr. Lee could see that the cell he was being placed into contained another inmate.

    When Mr. Lee got to the stairs near the cell and was told to enter the cell, he held the nearby rail for about a second, leaning away from the officers. Hartley, Young, Trumble and Gerencser snatched him off the rail and

slammed him headfirst into the wall with force that felt like it could have broken his neck. Lee felt extreme pain in his head and neck, and woozy, was almost unconscious and was badly dazed.

Hartley, Young, Trumble and Gerencser then walked him over a few steps and slammed him on the floor face-first, again causing tremendous pain. He was in handcuffs and shackles and could do nothing to stop the fall.

Hartley, Young, Trumble and Grimm will testify understatedly, as per their Incident Reports, that Mr. Lee "began to drop his personal body weight" and that they "placed Inmate Lee into the prone position." Mr. Lee will testify Hartley, Young, Gerencser and Trumble got on Mr. Lee's back, that Young did a knee strike to Lee's neck, the knee strike caused tremendous pain, and Mr. Lee thought he was going to die.

Mr. Lee will testify that Hartley hit Lee with his walkie talkie twice in the face and head; Young or Hartley covered his mouth cutting off his air because he yelled; and officers including Perkins and Coates twisted and pulled his shackles, as if trying to break Lee's ankles.

The officers pushed Mr. Lee, completely restrained, further into the cell. Young was leaning on the wall to balance himself while he had his knee on Mr. Lee's neck, and palmed his face to the ground.

Officer Young palmed Lee's face to the concrete with all his weight, which was extremely painful. Grimm, Perkins, Coates, Trumble, Young, Gerencser and Hartley were all yelling "stop resisting," but Lee will testify he was not resisting. Mr. Lee will testify that in his experience, officers are trained to say stop resisting even when inmates are not resisting.

White, Grimm, Perkins, Coates, Trumble, Young and Gerencser did not intervene when Hartley hit him with the walkie-talkie, although they could have and had time by the second blow. Likewise, Trumble, Young, Hartley, White, Grimm and Gerencser had the opportunity to stop Perkins and Coates from trying to break Lee's ankles but did not intervene.

Young, Hartley, Trumble, and Gerencser violently snatched on the waist chain and bent Lee's wrist backwards, as if attempting to break his wrist. Young, Hartley, and Gerencser took turns twisting Mr. Lee's wrist. Hartley tried to break his wrist. Trumble helped them, pulling on his arm. Officers kept telling Mr. Lee to stop resisting when he was restrained in handcuffs, with black box and waist chain, and shackles and could hardly move.

Officers kept bending and twisting his arm. Grimm said to pick up Mr. Lee and drag him into the cell. Young and Hartley picked Lee up by his neck and head. Gerencser, Young, Trumble and Perkins dropped him on his

stomach. Officer Young put his boot on Mr. Lee's chin and cheek, and walked over Lee as he left the room. All quickly exited the room, leaving Lee on the floor in pain. Grimm and White were supervisors who had the power to stop the excessive force but did not intervene.

Sgt. Perkins participated in bending Mr. Lee's limbs as if trying to break his arm, wrist, and legs. Hartley and Young bent Mr. Lee's arms, as if trying to break them. Young similarly bent Lee's wrist back against the waist chain.

## STAFF VIOLATIONS

The jury will learn that Capt. White was supposed to continue video recording until Mr. Lee was in the new cell, but that White intentionally and improperly had the camera turned off prematurely. FDC's Use of Force Video Recording Protocol mandates:

> Video recordings of all use of force incidents shall continue uninterrupted from commencement of recording until the situation is stable and under control and the inmate is placed in a secure cell or transport vehicle for transfer.

F.A.C. 33-602.210(4)(c)1.a. (eff. 3/1/2022).

The jury will learn that Captain White and his video operator, Steven Vega, were disciplined for failing to continue the video recording where it was anticipated that there would be resistance to placing Mr. Lee in the cell with another inmate.

11

In her May 30, 2024 memo to the Office of the Inspector General ("OIG") from the Santa Rosa C.I. Office of the Warden, Major LaToya Brown noted that Capt. White "closed the handheld video camera to cease recording operations, while staff were utilizing physical force."

Brown also noted that Capt. White violated procedure 208.039 by failing to note the "numerous allegations of staff misconduct" Mr. Lee made during the escort and that White should have noted the allegations on the use of force report and submitted a separate report for MINS processing.

Major Brown concluded:

> Corrective Action: Captain White will receiving [sic] remedial training and use of force as well as report writing criteria. A separate incident report was submitted for discipline due to the severity of the violations. Captain White was also spoken with about the importance of ensuring all events are captured in their entirety and the appearance of impropriety in the way the events unfolded.

Major Brown wrote a separate memorandum to OIG, that during the post use of force video, "Vega who was not trained properly on handheld camera usage lost visual of the inmate Lee while inside the cell."

## HARASSMENT

Mr. Lee will testify as to harassment he received at Santa Rosa and its effect on him.

12

In December 2021, as he left Santa Rosa C.I., five officers (not defendants here) told Mr. Lee he should never return to Santa Rosa, because if he did, they would "have something" for him, indicating they would punish him for his (prior) lawsuit.

Around November 2020, Officer Young told Mr. Lee he would kill him if he saw him on the street, that he doesn't like inmates who file lawsuits. Young was not a defendant in the other lawsuit, but worked in the rec yard with Officer Boatwright, who was a defendant.

Young, Coates and Gerencser at Main Unit called Mr. Lee a snitch in front of gang members to incite them to attack him. A cell mate said an officer at the Main Unit gave him a knife to stab Lee.

After the incident, every time Young saw Mr. Lee, Young would call him "baby girl," continuing the harassment.

## GRIEVANCE AND DISCIPLINARY REPORT

In late May 2024, Mr. Lee filed an informal grievance, which was approved: Inspector's office number 119-2405-1441.

A disciplinary report for disobeying a verbal order was initially issued against Mr. Lee but then never processed. There was never any disciplinary hearing regarding this matter and Mr. Lee was never found guilty of any wrongdoing.

13

## INJURIES

Mr. Lee repeatedly sought—and received—medical treatment for the injuries he received May 17, 2024.

The same day, Mr. Lee was seen cell front soon after the use of force, complained of left wrist pain and requested to see a mental health provider. Later that day he told medical staff that security stepped on his neck and that he had fallen on his head.

On May 20, 2024, Mr. Lee submitted an Inmate Sick-Call Request stating that due to the Incident, his neck "hurts extremely bad," his arms and both wrists hurt, and he had knots and bruises.

On May 23, 2024 a nurse prescribed Ibuprofen 600 mg and a muscle rub cream for Mr. Lee's pain. On June 4, 2024 a nurse saw Mr. Lee and ordered a sick call visit.

On June 3, 2024, Mr. Lee submitted an Inmate Sick-Call Request stating his neck was still sore from an officer putting his knee on his neck with all his weight while he was handcuffed and shackled.

On June 6, 2024, a nurse saw Mr. Lee regarding his neck, noted his symptoms were consistent with possible Torticollis, and prescribed a steroid injection, Solu-Medrol 125 mg. Torticollis, also known as wryneck or twisted

neck, is a twisting of the neck that causes the head to rotate and tilt at an odd angle. Neck muscle pain or pain down the spine are common symptoms.

On June 12, 2024, Mr. Lee submitted an Inmate Sick-Call Request stating that as a result of the May 17 Incident his "neck hurts so bad," that he'd been taking "K.O.P." (Keep On Person) medication 6 times a day, received a shot," which helped for three days, but now his neck hurts worse. He stated he was dizzy and weak and in extreme pain.

On June 12, 2024, a nurse ordered an x-ray with 2-3 views of Mr. Lee's cervical spine. On June 29, 2024, Mr. Lee's cervical spine was x-rayed, with 2 or 3 views. Dr. Yasser Mir reported "No acute fracture, dislocation or destructive bony process," but that an MRI was "clinically warranted."

On November 13, 2024, Mr. Lee submitted a Sick-Call Request complaining of ongoing neck pain due to the Incident six months prior, and stated that the steroid shot he received months ago helped for maybe two weeks but his pain still lingered, and that it hurts when he moves or lays down.

Mr. Lee's back had already been "messed up from the longest since the last incident" but hurt even worse, as a result of this incident.

Mr. Lee will testify as to his ongoing injuries from the Incident, that his neck was "still messed up from the injury" and that he could barely move his

15

neck sometimes. Also as a result of the incident, Mr. Lee's legs were "real sore," his ankle would "hurt real bad," and he had a cut on his ankle, for which he did not get medical treatment, but which "scratched the skin real bad." After the attack, Mr. Lee suffered dizziness for about 3 or 4 days.

Due to the attack, Mr. Lee continues to suffer pain from his lower back "all the way up," headaches, chronic neck pain, and pain in his arms. His right side collar bone and right shoulder still hurt, discomfort which comes and goes.

Dated: February 24, 2026.

Respectfully submitted,

*/s/ James V. Cook*
JAMES V. COOK (FBN 0966843)
Law Office of James Cook
314 West Jefferson Street
Tallahassee, FL 32301
(850) 222-8080; 561-0836 fax
cookjv@gmail.com

*/s/ Joshua Tarjan*
Joshua Tarjan (FBN 107092)
THE TARJAN LAW FIRM P.A.
12372 SW 82 Avenue
Pinecrest, FL 33156
(305) 423-8747
(323) 243-3186 (cell)
(786) 842-4430 (fax)
josh@tarjanlawfirm.com

*Co-counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2026, I electronically filed the foregoing document with the Clerk by using the CM/ECF system, which will serve a copy on all counsel of record.

By: */s/ Joshua Tarjan*
Joshua Tarjan